# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALAN AARON, ALPINE MEMBERS LLC, ANANDA OM LLC, ANANTA-OM FOUNDATION LLC, ANDREW E. BECK III, CEDOMIR CRNKOVIC, DELTA MASTER II, L.P., DIVE MEMBERS LLC, FLYING VENTURES LLC, GB MEMBERS LLC, K. DAVID ISAACS, YALE B. ISAACS, VIJAY JAYANT, KCP CAPITAL LTD., KNAFEL FAMILY FOUNDATION, KUBERA VENTURE CAPITAL FUND I, LP, SANJAY MOTWANI, KRZYSZTOF NYZIO, PROSPECT INNOVATIONS, L.P. – FUND SERIES 2, ROCKSTREAM MEMBERS LLC, VALERIE RUBSAMEN, SA 1107 LLC, DEEPAK SHAMDASANI, SHANTI FAMILY TRUST LLC, SHANTI FAMILY TRUST EXEMPT LLC, SHANTI FAMILY TRUST NON EXEMPT LLC, DAVID SILVER, SOBESHA LIMITED, SRETNO LLC, JENNA LEE VOLKWYN, STEVEN SVEN VOLKWYN, LONDA WEISMAN, WHIRE MEMBERS LLC, MALCOLM D. WINTER, 2011 WILLIAM SCHERLIS FAMILY IRREVOCABLE TRUST, and THE 734 TRUST, <br><br> Plaintiffs, <br><br> v. <br><br> CHRISTINE HUNSICKER, JASWINDER PAL SINGH, GEORGE GOLDENBERG, CHIRAG JAIN, SCOTT CALLON, JOHN HENNESSY, and DOES 1-50, <br><br> Defendants. | Case No.: <br><br><br> **COMPLAINT FOR DAMAGES** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Alan Aaron, Alpine Members LLC, Ananda OM LLC, Ananta-OM Foundation

LLC, Andrew E. (Trey) Beck III, Cedomir Crnkovic, Delta Master II, L.P., Dive Members LLC,

Flying Ventures LLC, GB Members LLC, K. David Isaacs, Yale B. Isaacs, Vijay Jayant, KCP

Capital Ltd., Knafel Family Foundation, Kubera Venture Capital Fund I, LP, Sanjay Motwani, Krzysztof Nyzio, Prospect Innovations, L.P. – Fund Series 2, Rockstream Members LLC, Valerie Rubsamen, SA 1107 LLC, Deepak Shamdasani, Shanti Family Trust LLC, Shanti Family Trust Exempt LLC, Shanti Family Trust Non Exempt LLC, David Silver, Sobesha Limited, Sretno LLC, Jenna Lee Volkwyn, Steven Sven Volkwyn, Londa Weisman, Whire Members LLC, Malcolm D. Winter, 2011 William Scherlis Family Irrevocable Trust, and The 734 Trust (collectively, "Plaintiffs"), by and through their undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.

Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation, the review and analysis of: (i) documents made available to investors in CaaStle, Inc. ("CaaStle" or the "Company"); (ii) documents publicly available in the action filed in the United States District Court for the Southern District of New York by the United States Securities and Exchange Commission ("SEC") against Christine M. Hunsicker ("Hunsicker") (the "SEC Action");[1] (iii) documents publicly filed in *In re CaaStle Inc.* (the "Bankruptcy Action");[2] (iv) documents publicly filed in *P180, Inc. v. CaaStle, Inc.*[3] and *P180, Inc. v. Singh et al.*;[4] and (v) other publicly available information concerning CaaStle.

## NATURE AND SUMMARY OF THE ACTION

1. Plaintiffs are CaaStle investors who were victims of a massive fraud perpetrated by defendant Hunsicker, with the aid of the other members in the Hunsicker Conspiracy, as described below.

---

[1]  Case No. 1:25-cv-05897 (S.D.N.Y.).
[2]  Bankr. Case No. 25-11187 (Bankr. D. Del.).
[3]  Case No. 1:25-cv-04432 (S.D.N.Y.).
[4]  Index No. 652451/2025 (N.Y. Sup. Ct.).

2.    Hunsicker lied to Plaintiffs and the rest of the world to make it appear that CaaStle was a success, lying specifically and repeatedly to each Plaintiff regarding CaaStle's financial condition and data.  She presented herself as a skillful and successful entrepreneur who built a robust e-commerce business that was led by a board of directors (the "Board") of notable leaders in corporate governance and finance and who raised hundreds of millions of dollars from wealthy and successful investors.

3.    Hunsicker had co-conspirators — many of the other Defendants (defined below) herein — with whom she created her house of cards.  Hunsicker and her co-conspirators repeatedly stated or implied that CaaStle had a large-scale business, a huge subscriber base, and spectacular financials.

4.    In fact, contrary to the repeated claims made to Plaintiffs that CaaStle had hundreds of thousands of subscribers and hundreds of millions of dollars in revenue, CaaStle had just a fraction of those subscribers, barely had any revenue, had supposedly spent hundreds of millions of dollars it received from investors, and had no viable business.  The whole thing was a sham, perpetuated by a pattern of persistent lying, obfuscation, and, eventually, a cover-up.

5.    With Hunsicker at the head of the conspiracy to defraud Plaintiffs, the Hunsicker Conspiracy also consisted of Hunsicker's long-time collaborators and confidants Jaswinder Pal Singh ("Singh"), George Goldenberg ("Goldenberg"), Chirag Jain ("Jain"), and, more recently, Scott Callon ("Callon"), and unknown others.

6.    At various points in time, Singh, Goldenberg, Jain, and Callon served on CaaStle's Board and/or as executives of the Company.  Based on public reporting, some combination of the Hunsicker Conspiracy members operated for years.

7.     Defendant John Hennessy ("Hennessy") served on the CaaStle Board from March 1, 2020 to December 18, 2024.  Hennessy is the current chairman of Alphabet and former long-time president of Stanford University.  Hennessy knew that his presence on the Board would serve as a critical endorsement of Hunsicker and her compatriots.  Rather than carefully performing his duties as a Board member, Hennessy did virtually nothing to ensure that CaaStle operated within legal bounds, all while knowing that investors would be reassured knowing he was a director.

8.     At least Hunsicker, Goldenberg, Jain, and Singh faked financial information and fabricated subscriber data.  Since at least 2023, when CaaStle's independent auditor, BDO USA, LLP ("BDO"), quit after learning that Hunsicker used its logo in connection with falsified numbers, the Hunsicker Conspiracy has also been engaged in covering its tracks.  At that point, Defendants knew, or in the exercise of reasonable diligence should have known, about the fraudulent scheme, yet disregarded the information and continued to participate in the Hunsicker Conspiracy anyway.  And, at the latest, by November 2024, Hunsicker, Singh, Goldenberg, Jain, and Callon were actively participating in the Hunsicker Conspiracy, including, without limitation, by concealing CaaStle's true financial state and its fraudulent activities.

9.     Central to the scheme was a pattern of fraud and misrepresentation.  Multiple times over the course of several years, members of the Hunsicker Conspiracy fraudulently induced Plaintiffs to make further investments in CaaStle so the funds could be used for their own benefit — including, by way of example, to hide, continue, or mitigate their fraud at CaaStle.

10.     The Hunsicker Conspiracy members also caused CaaStle's money to be fraudulently transferred to themselves.  Specifically, the Hunsicker Conspiracy fraudulently transferred money to personal accounts based upon alleged share purchases of CaaStle's worthless stock.

11.     By no later than November 2024, CaaStle's leadership — including Defendants — was fully aware of the fraudulent activities occurring at CaaStle. At that point, Defendants knew, or should have known, that given the long-running fraud, there was no viable path forward for CaaStle to continue as a going concern. In addition, CaaStle was facing allegations of unauthorized trademark use.

12.     However, from November 2024 through March 2025, in the face of cascading liabilities, rather than going public, coming clean, and winding down business, the members of the Hunsicker Conspiracy kept quiet, failing to tell CaaStle investors the truth. Worse, the Hunsicker Conspiracy members continued to make statements to Plaintiffs and other investors that they knew to be false regarding CaaStle's subscribers, revenue, scale, and financial health.

13.     For Callon, the nature of this intentional behavior is made more egregious by the fact that he is purported to be an expert on corporate governance, enlisted by at least one foreign government for corporate governance guidance. As he is described by *Forbes*, "Callon became the only non-Japanese to serve on a government committee that drafted Japan's Corporate Governance Code, which was enacted in 2015." Yet, since at least November 2024, he actively participated in failing to disclose, and thereby covering up, the fraud at CaaStle as part of the Hunsicker Conspiracy, up to and including allowing Hunsicker to continue to provide updates to investors and communicate on behalf of the Company months into 2025.

14.     Further underscoring the nature of the fraudulent scheme, Hennessy left the CaaStle Board on December 18, 2024, but he failed to notify investors or take any action to disclose what had occurred under his watch.

15.     Indeed, throughout the beginning of 2025, the Hunsicker Conspiracy members continued to control CaaStle and even adopted a new strategy: induce a further transaction with

P180, Inc. ("P180") to create the illusion of forward momentum for CaaStle and ultimately to force a merger or transfer of assets that would effectively conceal their fraud. This was a calculated move to shift legal and financial exposure from a company with no viable business and a long history of misrepresentations into another company that, despite having been damaged, still retained independent assets. Plaintiffs were the victims of these multiple fraudulent acts and intentional and/or negligent misrepresentations.

16.     Hunsicker and the co-conspirators kept silent about the CaaStle fraud until late March 2025, and only disclosed it at that point because it was obvious that the CaaStle fraud would inevitably become public. In a letter to shareholders that identified an investigation by law enforcement authorities into CaaStle, they finally disclosed that Hunsicker had "misstated financial statements and falsified audit opinions, as well as capitalization information that understated the number of company shares outstanding."

17.     Not surprisingly, CaaStle's disclosures to its investors were picked up by numerous media outlets. While the media has rightly focused on Hunsicker's flagrant fraud at CaaStle, the full story of the Hunsicker Conspiracy's fraudulent activities has yet to be told.

18.     On June 20, 2025, CaaStle filed for Chapter 7 bankruptcy.

19.     Plaintiffs seek to recover the damages caused by Defendants' fraudulent conduct, and to hold Defendants accountable for their blatant deception regarding CaaStle and its finances. Plaintiffs relied on Defendants' misrepresentations in making their investments in CaaStle and in deciding to hold those investments. Defendants knowingly, recklessly, and/or negligently committed the acts described herein and/or provided substantial assistance in the massive scheme, causing Plaintiffs substantial damages. Had Plaintiffs known the truth, they would not have invested, made additional investments, or maintained their investments in CaaStle.

20.     Plaintiffs assert direct claims under the Securities Exchange Act of 1934 (the "Exchange Act") and for common law fraud, aiding and abetting fraud, civil conspiracy, negligent misrepresentation, and aiding and abetting negligent misrepresentation against Defendants for conducting and enabling a massive fraud orchestrated by Hunsicker through CaaStle. Plaintiffs do not assert claims in this action that belong to the Chapter 7 bankruptcy trustee and that are otherwise property or assets of the Company's estate.

21.     Plaintiffs collectively invested more than $80 million in CaaStle and have suffered devastating losses as a result of Defendants' fraud and other violations of law.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23.     This Court has subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as those claims arise out of the same case or controversy as Plaintiffs' federal claims.

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

25.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because CaaStle was headquartered in and resides in this District, and many of the acts and omissions that constitute the alleged violations of law occurred in this District.

26.     This Court has personal jurisdiction over all Defendants because the acts and omissions that constitute the alleged violations of law were conducted in substantial part in New York and CaaStle has its principal place of business in New York.

## PARTIES

### A.     Plaintiffs

27.     Plaintiff Alan Aaron ("Aaron") is an individual who resides in Miami Beach, Florida.  Aaron is the beneficial owner of the following CaaStle securities purchased on his behalf from CaaStle by Next Generation Trust Company as custodian for the benefit of Aaron's IRA: (i) 24,193 shares of Series A-12 Preferred Stock purchased on or around February 21, 2020, at a purchase price of $6.20 per share, or $150,000; (ii) 16,129 shares of Series A-12 Preferred Stock purchased on or around August 4, 2021, at a purchase price of $6.20 per share, or $100,000; (iii) 16,129 shares of Series A-12 Preferred Stock purchased on or around February 28, 2023, at a purchase price of $6.20 per share, or $100,000; and (iv) 12,097 shares of Series A-12 Preferred Stock purchased on or around September 11, 2023, at a purchase price of $6.20 per share, or $75,000.  In total, Aaron invested $425,000 in CaaStle.

28.     Plaintiff Alpine Members LLC ("Alpine") is a Delaware limited liability company with its principal place of business in New York, New York.  Alpine purchased the following securities from CaaStle: (i) 181,451 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 268,549 shares of common stock at a purchase price of $0 per share, on or around June 28, 2022, for an aggregate purchase price of $1,125,000; and (ii) 80,645 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 276,497 shares of common stock at a purchase price of $0 per share, on or around September 14, 2022, for an aggregate purchase price of $500,005.  In total, Alpine invested $1,625,005 in CaaStle.

29.     Plaintiff Ananda OM LLC ("Ananda OM") is a Delaware limited liability company with its principal place of business in Greenwich, Connecticut.  Ananda OM is the holder of the following CaaStle securities: (i) 610,002 shares of Series A-10 Preferred Stock purchased on or

around September 1, 2017, at a purchase price of $5.06 per share, or $3,086,610.12; (ii) 171,839 shares of Series A-11 Preferred Stock purchased on or around January 7, 2019, at a purchase price of $5.15 per share, or $884,970.85; (iii) 673,786 shares of Series A-11 Preferred Stock purchased on or around April 5, 2019, at a purchase price of $5.15 per share, or $3,469,997.90; (iv) 199,898 shares of Series A-12 Preferred Stock purchased on or around December 21, 2021, at a purchase price of $6.20 per share, or $1,239,367.60; (v) 113,875 shares of Series A-12 Preferred Stock purchased on or around May 24, 2022, at a purchase price of $6.20 per share and 81,625 shares of common stock purchased on or around May 24, 2022, at a purchase price of $0 per share, for an aggregate purchase price of $706,025; (vi) 67,353 shares of Series A-12 Preferred Stock purchased on or around August 12, 2022, at a purchase price of $6.20 per share and 211,038 shares of common stock purchased on or around August 12, 2022, at a purchase price of $0 per share, for an aggregate purchase price of $417,588.60; (vii) 54,436 shares of Series A-12 Preferred Stock purchased on or around September 14, 2022, at a purchase price of $6.20 per share and 170,564 shares of common stock purchased on or around September 14, 2022, at a purchase price of $0 per share, for an aggregate purchase price of $337,500; (viii) 72,581 shares of Series A-12 Preferred Stock purchased on or around September 27, 2022, at a purchase price of $6.20 per share and 227,419 shares of common stock purchased on or around September 27, 2022, at a purchase price of $0 per share, for an aggregate purchase price of $450,002.20; (ix) 161,291 shares of Series A-12 Preferred Stock purchased on or around November 14, 2022, at a purchase price of $6.20 per share and 800,251 shares of common stock purchased on or around November 14, 2022, at a purchase price of $0 per share, for an aggregate purchase price of $1,000,004.20; and (x) 40,323 shares of Series A-12 Preferred Stock purchased on or around January 27, 2023, at a purchase price of $6.20 per share and 126,344 shares of common stock purchased on or around January 27, 2023,

at a purchase price of $0 per share, for an aggregate purchase price of $250,002.60.  In total, Ananda OM invested $11,842,069.07 in CaaStle.

30.    Plaintiff Ananta-OM Foundation LLC ("Ananta-OM Foundation") is a Delaware limited liability company with its principal place of business in Greenwich, Connecticut.  Ananta-OM Foundation is the holder of the following CaaStle securities: (i) 1,111,111 shares of Series A-9 Preferred Stock purchased on or around May 17, 2016, at a purchase price of $4.50 per share, or $4,999,999.50; (ii) 37,518 shares of Series A-12 Preferred Stock purchased on or around August 12, 2022, at a purchase price of $6.20 per share and 117,556 shares of common stock purchased on or around August 12, 2022, at a purchase price of $0 per share, for an aggregate purchase price of $232,611.60; and (iii) 72,582 shares of Series A-12 Preferred Stock purchased on or around August 18, 2023, at a purchase price of $6.20 per share and 419,354 shares of common stock purchased on or around August 18, 2023, at a purchase price of $0 per share, for an aggregate purchase price of $450,000.  In total, Ananta-OM Foundation invested $5,682,611.10 in CaaStle.

31.    Plaintiff Andrew E. (Trey) Beck III ("Beck") is an individual who resides in Brooklyn, New York.  Beck is the holder of the following CaaStle securities: (i) 961,538 shares of Series A-2 Preferred Stock purchased on or around March 25, 2014, for a purchase price of $1.04 per share, or $1,000,000; (ii) 93,977 shares of Series A-6 Preferred Stock purchased on or around November 7, 2014, for a purchase price of $2.66 per share, or $250,000; (iii) 229,280 shares of Series A-7 Preferred Stock purchased on or around April 7, 2015, for a purchase price of $3.27 per share, or $750,000; (iv) 70,234 shares of Series A-8 Preferred Stock purchased on or around September 1, 2016, for a purchase price of $4.50 per share, or $316,055; (v) 23,419 shares of Series A-5 Preferred Stock purchased on or around September 9, 2016, for a purchase price of $2.04 per share, or $47,762; (vi) 222,222 shares of Series A-9 Preferred Stock purchased on or

around July 7, 2016, for a purchase price of $4.50 per share, or $1,000,000; (vii) 5,000 common shares (exercise of option) purchased on or around June 26, 2017, for a purchase price of $1,250; (viii) 53,763 common shares purchased on or around February 5, 2018, for a purchase price of $4.65 per share, or $249,998; (ix) 48,544 shares of Series A-11 Preferred Stock purchased on or around January 10, 2019, for a purchase price of $5.15 per share, or $250,000; (x) 139,872 shares of Series A-12 Preferred Stock purchased on or around November 19, 2021, for a purchase price of $6.20 per share, or $867,206; and (xi) 128,205 shares of Series A-12 Preferred Stock purchased on or around July 21, 2023, for a purchase price of $1.95 per share, or $250,000, in a secondary purchase.  In total, Beck invested $4,982,271 in CaaStle.

32.     Plaintiff Cedomir Crnkovic ("Crnkovic") is an individual who resides in New York, New York.  On or around September 8, 2023, Crnkovic purchased 56,452 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 332,437 shares of common stock at a purchase price of $0 per share for an aggregate purchase price of $350,002.40.

33.     Plaintiff Delta Master II, L.P. ("Delta") is a Delaware limited partnership with its principal place of business in Palm Beach, Florida.  Delta purchased the following CaaStle securities: (i) on or around April 13, 2017, 696,960 shares of Series A-10 Preferred Stock at a purchase price of $5.06 per share, or $3,526,617.60; (ii) on or around August 30, 2022, 306,429 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 1,100,875 shares of common stock at a purchase price of $0 per share for an aggregate purchase price of $1,899,859.80; and (iii) on or around April 11, 2023, 24,194 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 175,806 shares of common stock at a purchase price of $0 per share for an aggregate purchase price of $150,002.80.  In total, Delta invested $5,576,480.20 in CaaStle.

34.     Plaintiff Dive Members LLC ("Dive") is a Delaware limited liability company with its principal place of business in New York, New York.  On or around November 30, 2021, Dive purchased 354,839 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 224,109 shares of common stock at a purchase price of $0 for an aggregate purchase price of $2,200,002.

35.     Plaintiff Flying Ventures LLC ("Flying Ventures") is a Delaware limited liability company with its principal place of business in New York, New York.  Flying Ventures purchased the following CaaStle securities: (i) 28,546 shares of Series A-4 Preferred Stock on or around August 1, 2014, at a purchase price of $50,000; (ii) 24,517 shares of Series A-5 Preferred Stock on or around October 3, 2014, at a purchase price of $50,000; and (iii) on or around October 6, 2022, 16,129 shares of Series A-12 Preferred Stock and 50,538 shares of common stock for an aggregate purchase price of $100,000.  In total, Flying Ventures invested $200,000 in CaaStle.

36.     Plaintiff GB Members LLC ("GB") is a Delaware limited liability company with its principal place of business in New York, New York.  GB purchased the following CaaStle securities: (i) 2,498,438 shares of Series A Preferred Stock on or around March 7, 2013, at a purchase price of $0.64 per share, or $1,600,000; (ii) 159,208 shares of Series A-1 Preferred Stock on or around February 7, 2014, at a purchase price of $0.77 per share, or $122,893; (iii) 208,336 shares of Series A-2 Preferred Stock on or around June 9, 2014, at a purchase price of $1.04 per share, or $216,669; (iv) 131,994 shares of Series A-3 Preferred Stock on or around August 26, 2014, at a purchase price of $1.41 per share, or $186,429; (v) 68,556 shares of Series A-5 Preferred Stock on or around December 18, 2015, at a purchase price of $2.04 per share, or $139,813; (vi) 54,297 shares of Series A-6 Preferred Stock on or around December 18, 2015, at a purchase price of $2.66 per share, or $144,441; (vii) 277,589 shares of Series A-8 Preferred Stock on or

around June 2, 2017, at a purchase price of $4.21 per share, or $1,168,650; (viii) 194,289 shares of Series A-9 Preferred Stock on or around June 2, 2017, at a purchase price of $4.50 per share, or $874,300; (ix) 414,837 shares of Series A-10 Preferred Stock on or around August 17, 2018, at a purchase price of $5.06 per share, or $2,099,075; and (x) 144,200 shares of Series A-11 Preferred Stock on or around August 17, 2018, at a purchase price of $5.15 per share, or $742,630.  In total, GB invested $7,294,900 in CaaStle.

37.    Plaintiff K. David Isaacs ("K. Isaacs") is an individual who resides in Nassau County, New York.  K. Isaacs purchased the following CaaStle securities: (i) on or around August 6, 2020, 8,065 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 3,047 shares of common stock at a purchase price of $0 per share for an aggregate purchase price of $50,000; (ii) on or around March 8, 2023, 8,065 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 47,490 shares of common stock at a purchase price of $0 per share for an aggregate purchase price of $50,000; and (iii) on or around September 1, 2023, 6,452 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 37,992 shares of common stock a purchase price of $0 per share for an aggregate purchase price of $40,000.  In total, K. Isaacs invested $140,000 in CaaStle.

38.    Plaintiff Yale B. Isaacs ("Y. Isaacs") is an individual who resides in New York, New York.  Y. Isaacs purchased the following CaaStle securities: (i) on or around March 8, 2023, 1,613 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 9,498 shares of common stock at a purchase price of $0 per share for an aggregate purchase price of $10,000; and (ii) on or around September 1, 2023, 1,613 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 9,498 shares of common stock at a purchase price of $0 per share for an aggregate purchase price of $10,000.  In total, Y. Isaacs invested $20,000 in CaaStle.

13

39.     Plaintiff Vijay Jayant ("Jayant") is an individual who resides in New York, New York.  Jayant purchased the following CaaStle securities: (i) 388,651 shares of Series A-1 Preferred Stock on or around November 13, 2013, for a purchase price of $300,000; (ii) 71,258 shares of Series A-8 Preferred Stock on or around June 4, 2015, for a purchase price of $300,000; (iii) 64,516 shares of Series A-12 Preferred Stock on or around June 30, 2021, for a purchase price of $400,000; and (iv) 80,645 shares of Series A-12 Preferred Stock on or around October 4, 2021, for a purchase price of $500,000.  In total, Jayant invested $1,500,000 in CaaStle.

40.     Plaintiff KCP Capital Ltd. ("KCP Capital") is a United Arab Emirates corporation with its principal place of business in Dubai, United Arab Emirates.  KCP Capital purchased 346,153 shares of Series A-2 Preferred Stock on or around February 18, 2014, for a purchase price of $360,000.

41.     Plaintiff Knafel Family Foundation ("KF Foundation") is a New York nonprofit with its principal place of business in New York, New York.  On or around August 6, 2020, KF Foundation purchased 374,999 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 141,667 shares of common stock at a purchase price of $0 per share for an aggregate purchase price of $2,325,000.

42.     Plaintiff Kubera Venture Capital Fund I, LP ("Kubera") is a Delaware limited partnership with its principal place of business in Denver, Colorado.  Kubera purchased the following CaaStle securities: (i) 66,935 shares of Series A-12 Preferred Stock and 265,065 warrants to purchase common stock on or around February 17, 2023, for an aggregate purchase price of $415,000 and fee to Cava Capital, LLC ("Cava")[5] of $14,525; and (ii) 86,312 shares of

---

[5] Cava is a venture capital investment firm based in Darien, Connecticut that aided with CaaStle's fundraising, including funneling potential investors to the Company and drafting pitch decks.

Series A-12 Preferred Stock and 349,904 warrants to purchase common stock on or around May 18, 2023, for an aggregate purchase price of $600,000.[6]  In total, with fees, Kubera Venture invested $1,050,525 in CaaStle.

43.    Plaintiff Sanjay Motwani ("Motwani") is an individual who resides in New York, New York.  Motwani purchased the following CaaStle securities: (i) 415,675 shares of Series A-8 Preferred Stock on or around May 26, 2016; (ii) options for 24,049 shares of common stock given on or around January 27, 2017; (iii) 111,111 shares of Series A-9 Preferred Stock on or around April 10, 2017; (iv) 29,644 shares of Series A-10 Preferred Stock on or around November 1, 2017; and (v) 13,694 shares of Series A-11 Preferred Stock on or around August 27, 2018.  In total, Motwani invested $2,476,526.24 in CaaStle.

44.    Plaintiff Krzysztof Nyzio ("Nyzio") is an individual who resides in Stamford, Connecticut.  Nyzio purchased the following CaaStle securities: (i) on or around May 25, 2022, 16,125 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 48,375 shares of CaaStle common stock at a purchase price of $0, for an aggregate purchase price of $99,975; and (ii) on or around August 18, 2023, 4,033 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 20,967 shares of CaaStle common stock at a purchase price of $0, for an aggregate purchase price of $25,004.60.  In total, Nyzio invested $124,979.60 in CaaStle.

45.    Plaintiff Prospect Innovations, L.P. – Fund Series 2 ("Prospect") is a Delaware limited partnership with its principal place of business in Kingston, New York.  Prospect purchased

---

[6]  Pursuant to a consulting agreement with South Main Holdings, LLC ("South Main") (a party affiliated with Cava), South Main received 14,516 shares of the Preferred Stock and 50,916 warrants as part of its compensation from Kubera, leaving Kubera with 73,365 shares of the Preferred Stock and 297,418 warrants which were exercised on or around June 1, 2023.  Kubera also paid Cava a consulting fee of $21,000.

the following CaaStle securities: (i) on or around September 27, 2022, 67,006 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 209,952 shares of common stock at a purchase price of $0 per share, for an aggregate purchase price of $415,437.20; and (ii) on or around November 18, 2022, 673,480 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 1,638,862 shares of common stock at a purchase price of $0 per share, for an aggregate purchase price of $4,175,572.84.  In total, Prospect invested $4,591,010.04 in CaaStle.

46.    Plaintiff Rockstream Members LLC ("Rockstream") is a Delaware limited liability company with its principal place of business in New York, New York.  On or around August 20, 2021, Rockstream purchased 322,581 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share, or $1,999,997.

47.    Plaintiff Valerie Rubsamen ("Rubsamen") is an individual who resides in New York, New York.  Rubsamen is the holder of the following CaaStle securities: (i) 647,752 shares of Series A-1 Preferred Stock purchased on or around December 20, 2013, at a purchase price of $0.77 per share, or $499,999.77; (ii) 192,307 shares of Series A-2 Preferred Stock purchased on or around March 16, 2014, at a purchase price of $1.04 per share, or $199,999.28; and (iii) 97,087 shares of Series A-11 Preferred Stock purchased on or around March 7, 2019, at a purchase price of $5.15 per share, or $499,998.05.  In total, Rubsamen invested $1,199,997.10 in CaaStle.[7]

48.    Plaintiff SA 1107 LLC ("SA 1107") is a Colorado limited liability company with its principal place of business in Providenciales, Turks & Caicos.  SA 1107 is the holder of 48,646 shares of Series A-12 Preferred Stock purchased on or around December 7, 2023 at a purchase price of $6.20 per share, or $301,605.20.

---

[7] The shares held by Rubsamen were originally purchased by her husband, Plaintiff Crnkovic, and subsequently transferred to her by Crnkovic for estate planning purposes.

49.     Plaintiff Deepak Shamdasani ("Shamdasani") is an individual who resides in New York, New York.  Shamdasani purchased 177,003 shares of Series A-3 Preferred Stock on or around May 30, 2014, for a purchase price of $250,000.

50.     Plaintiff Shanti Family Trust LLC ("Shanti") is a Delaware limited liability company with its principal place of business in Greenwich, Connecticut.  Shanti is the holder of the following CaaStle securities: (i) 444,444 shares of Series A-9 Preferred Stock purchased on or around May 17, 2016, at a purchase price of $4.50 per share, or $1,999,998; and (ii) 378,140 shares of Series A-10 Preferred Stock purchased on or around September 1, 2017, at a purchase price of $5.06 per share, or $1,913,388.40.  In total, Shanti invested $3,913,386.40 in CaaStle.

51.     Plaintiff Shanti Family Trust Exempt LLC ("Shanti Exempt") is a Delaware limited liability company with its principal place of business in Greenwich, Connecticut.  Shanti Exempt is the holder of the following CaaStle securities: (i) 666,666 shares of Series A-9 Preferred Stock purchased on or around May 17, 2016, at a purchase price of $4.50 per share, or $2,999,997; (ii) 420,935 shares of Series A Preferred Stock purchased on or around October 23, 2017, at a purchase price of $4.68 per share, or $1,969,975.80; (iii) 171,360 shares of Series A-12 Preferred Stock purchased on or around February 12, 2020, at a purchase price of $6.20 per share, or $1,062,432; and (iv) 80,645 shares of Series A-12 Preferred Stock purchased on or around November 14, 2022, at a purchase price of $6.20 per share and 400,123 shares of common stock at a purchase price of $0 per share, for an aggregate purchase price of $499,999.  In total, Shanti Exempt invested $6,532,403.80 in CaaStle.

52.     Plaintiff Shanti Family Trust Non Exempt LLC ("Shanti Non Exempt") is a Delaware limited liability company with its principal place of business in Greenwich, Connecticut. Shanti Non Exempt is the holder of the following CaaStle securities: (i) 50,291 shares of Series

A-12 Preferred Stock purchased on or around August 12, 2022, at a purchase price of $6.20 per share and 157,578 shares of common stock purchased on or around August 12, 2022, at a purchase price of $0 per share, for an aggregate purchase price of $311,804.20; (ii) 40,323 shares of Series A-12 Preferred Stock purchased on or around January 27, 2023, at a purchase price of $6.20 per share and 126,344 shares of common stock purchased on or around January 27, 2023, at a purchase price of $0 per share, for an aggregate purchase price of $250,002.60; and (iii) 76,613 shares of Series A-12 Preferred Stock purchased on or around August 18, 2023, at a purchase price of $6.20 per share and 398,387 shares of CaaStle common stock purchased on or around August 18, 2023, at a purchase price of $0 per share, for an aggregate purchase price of $475,000.60.  In total, Shanti Non Exempt invested $1,036,807.40 in CaaStle.

53.     Plaintiff David Silver ("Silver") is an individual who resides in New York, New York.  Silver purchased the following CaaStle securities: (i) 8,065 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 3,047 shares of common stock at a purchase price of $0 per share, on or around August 6, 2020, for an aggregate purchase price of $50,000; (ii) 40,323 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 237,454 shares of common stock at a purchase price of $0 per share, on or around March 8, 2023, for an aggregate purchase price of $250,003; and (iii) 16,129 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 94,982 shares of common stock at a purchase price of $0 per share, on or around September 1, 2023, for an aggregate purchase price of $100,000.  In total, Silver invested $400,003 in CaaStle.

54.     Plaintiff Sobesha Limited ("Sobesha") is a British Virgin Islands corporation with its principal place of business in Zug, Switzerland.  Sobesha purchased the following CaaStle securities: (i) on or around November 11, 2021, 403,225 shares of Series A-12 Preferred Stock at

a purchase price of $6.20 per share and 60,932 shares of common stock at a purchase price of $0 per share for an aggregate purchase price of $2,500,000; and (ii) on or around January 13, 2022, 80,645 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share, or $499,999. In total, Sobesha invested $2,999,999 in CaaStle.

55.     Plaintiff Sretno LLC ("Sretno") is a Delaware limited liability company with its principal place of business in New York, New York.  Sretno purchased the following CaaStle securities: (i) on or around December 20, 2013, 647,752 shares of Series A-1 Preferred Stock at a purchase price of $0.77 per share, or $499,999.77; (ii) on or around March 16, 2014, 192,307 shares of Series A-2 Preferred Stock at a purchase price of $1.04 per share, or $199,999.28; (iii) on or around March 7, 2019, 97,087 shares of Series A-11 Preferred Stock at a purchase price of $5.15 per share, or $499,998.05; (iv) on or around July 28, 2022, 80,646 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 252,688 shares of CaaStle common stock at a purchase price of $0 per share for an aggregate purchase price of $500,005.20; (v) on or around September 14, 2022, 80,646 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 252,688 shares of CaaStle common stock at a purchase price of $0 per share for an aggregate purchase price of $500,005.20; and (vi) on or around February 23, 2023, 48,387 shares of Series A-12 Preferred Shares at a purchase price of $6.20 per share and 251,613 shares of CaaStle common stock at a purchase price of $0 per share for an aggregate purchase price of $299,999.40.  In total, Sretno invested $2,500,006.90 in CaaStle.

56.     Plaintiff Jenna Lee Volkwyn ("J. Volkwyn") is an individual who resides in Winchester, United Kingdom.  J. Volkwyn purchased the following CaaStle securities: (i) 118,765 shares of Series A-8 Preferred Stock on or around September 7, 2016, for a purchase price of $4.21 per share, or $500,000; (ii) 111,111 shares of Series A-9 Preferred Stock on or around April 12,

2017, for a purchase price of $4.50 per share, or $500,000; (iii) 48,543 shares of Series A-11 Preferred Stock on or around November 6, 2017, for a purchase price of $5.15 per share, or $250,000; and (iv) 50,485 shares of Series A-11 Preferred Stock on or around February 26, 2019, for a purchase price of $5.15 per share, or $260,000.  In total, J. Volkwyn invested $1,510,000 in CaaStle.

57.    Plaintiff Steven Sven Volkwyn ("S. Volkwyn") is an individual who resides in Hoboken, New Jersey.  S. Volkwyn purchased the following CaaStle securities: (i) 118,765 shares of Series A-8 Preferred Stock on or around September 7, 2016, for a purchase price of $4.21 per share, or $500,000; (ii) 111,111 shares of Series A-9 Preferred Stock on or around April 12, 2017, for a purchase price of $4.50 per share, or $500,000; (iii) 97,087 shares of Series A-11 Preferred Stock on or around November 6, 2017, for a purchase price of $5.15 per share, or $500,000; and (iv) 50,485 shares of Series A-11 Preferred Stock on or around February 26, 2019, for a purchase price of $5.15 per share, or $260,000.  In total, S. Volkwyn invested $1,760,000 in CaaStle.

58.    Plaintiff Londa Weisman ("Weisman") is an individual who resides in New York, New York.  On or around August 20, 2021, Weisman purchased 80,645 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share, or $500,000.

59.    Plaintiff Whire Members LLC ("Whire") is a Delaware limited liability company with its principal place of business in New York, New York.  Whire purchased the following CaaStle securities: (i) 152,710 shares of Series A-11 Preferred Stock on or around August 17, 2018, at a purchase price of $5.15 per share, or $786,457; and (ii) 324,100 shares of Series A-12 Preferred Stock on or around March 4, 2020, at a purchase price of $6.20 per share, or $2,009,420.  In total, Whire invested $2,795,877 in CaaStle.

60. Plaintiff Malcolm D. Winter ("Winter") is an individual who resides in Loudoun County, Virginia. Winter purchased the following CaaStle securities: (i) 323,876 shares of Series A-1 Preferred Stock on or around December 9, 2013, for a purchase price of $0.77 per share, or $249,384.52; (ii) 176,123 shares of Series A-4 Preferred Stock on or around October 7, 2014, for a purchase price of $1.75 per share, or $308,215.25; (iii) 39,741 shares of Series A-7 Preferred Stock on or around February 5, 2015, for a purchase price of $3.27 per share, or $129,953.07; and (iv) 58,252 shares of Series A-11 Preferred Stock on or around August 1, 2018, for a purchase price of $5.15 per share, or $299,997.80. In total, Winter invested $987,550.64 in CaaStle.

61. Plaintiff 2011 William Scherlis Family Irrevocable Trust ("Scherlis") is a Pennsylvania trust, for which William Scherlis serves as trustee. Scherlis purchased the following CaaStle securities: (i) 78,076 shares of Series A Preferred Stock on or around March 1, 2013 at a purchase price of $0.64 per share, or $50,000; (ii) 5,492 shares of Series A-1 Preferred Stock on or around January 15, 2014 at a purchase price of $0.77 per share, or $4,240; (iii) 6,378 shares of Series A-2 Preferred Stock on or around May 29, 2014 at a purchase price of $1.04 per share, or $6,634; (iv) 1,733 shares of Series A-4 Preferred Stock on or around November 23, 2015 at a purchase price of $1.75 per share, or $3,035.35; (v) 8,064 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 3,047 shares of common stock at a purchase price of $0 per share, on or around August 6, 2020, for an aggregate purchase price of $50,000; and (vi) 9,678 shares of Series A-12 Preferred Stock at a purchase price of $6.20 per share and 56,988 shares of common stock at a purchase price of $0 per share, on or around March 7, 2023, for an aggregate purchase price of $60,003.60. In total, Scherlis invested $173,912.95 in CaaStle.

62.     Plaintiff The 734 Trust ("734 Trust") is a Delaware trust, for which J. Guy Merison serves as trustee.  On or around April 11, 2022, 734 Trust purchased 70,000 shares of Series A-12 Preferred Stock for a purchase price of $6.20 per share, or $434,000.

63.     Plaintiffs Nyzio, Ananda OM, Ananta-OM Foundation, Shanti, Shanti Exempt, and Shanti Non Exempt are collectively referred to herein as the "Ananta Group."

64.     Plaintiffs Scherlis, Alpine, Dive, GB, K. Isaacs, Y. Isaacs, KF Foundation, Rockstream, Silver, Weisman, and Whire are collectively referred to herein as the "GB Group."

**B.     Defendants**

65.     Hunsicker co-founded CaaStle and served as its Chief Executive Officer ("CEO") and as Board Chair until December 14, 2024.  Hunsicker resides in New Jersey and New York.

66.     Singh co-founded CaaStle and served as a director of the Company at various relevant times and as Board Chair since December 18, 2024.  Singh resides in New York.

67.     Goldenberg serves as CaaStle's Chief Operating Officer ("COO"), its interim CEO, and as a director.  Goldenberg resides in Los Altos, California.

68.     Jain served at all relevant times as an executive of CaaStle, and as Head of Finance. Upon information and belief, Jain is domiciled in India but presently resides in California.

69.     Callon served as a director of CaaStle at all relevant times.  Upon information and belief, Callon is domiciled in Saratoga, California but resides in Tokyo.  Callon is purportedly an expert on corporate governance.

70.     Hennessy served as a director of CaaStle from March 1, 2020 to December 18, 2024.  Upon information and belief, Hennessy resides in Atherton, California.

71.     The true names and capacities of Does 1 through 50, whether individual, corporate, associate, or otherwise, are unknown to Plaintiffs at the time of filing this Complaint.  Plaintiffs

therefore sue said defendants by such fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been ascertained.  Plaintiffs are informed and believe, and therefore allege, that each of the Doe defendants is, in some manner, responsible for the events and happenings alleged herein and proximately caused injury and damages to Plaintiffs as herein alleged.

72.     Plaintiffs are informed and believe, and on that basis allege, that each Defendant named in this action was the agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative, and/or associate of each of the other Defendants, and was at all times relevant herein acting within the course and scope of his, her, or its authority as agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate, and with the knowledge, authorization, consent, permission, and/or ratification of the other Defendants.

73.     Hunsicker, Singh, Goldenberg, Jain, and Callon are sometimes referred to collectively herein as the "Hunsicker Conspiracy" or "Hunsicker Conspiracy Defendants," and with Hennessy, "Defendants."

**C.     Relevant Non-Parties**

74.     Nonparty CaaStle is a privately held Delaware corporation headquartered in New York, New York.  As a result of CaaStle's bankruptcy, CaaStle cannot be named as a defendant in this lawsuit.

75.     Nonparty Monica Blacker ("Blacker") has served as an independent director of the Company since April 2025.

## SUBSTANTIVE ALLEGATIONS

### I.     Background

76.     Defendant Hunsicker founded Gwynnie Bee, Inc. ("Gwynnie Bee"), a subscription clothing rental company for plus-size women, in 2011 as a limited liability company.  In December 2011, the Company was converted into a C corporation.  Through Gwynnie Bee, Hunsicker cultivated relationships with clothing brands and began engaging with them on a way to monetize their unsold inventory.

77.     In November 2018, Hunsicker and Singh rebranded Gwynnie Bee as CaaStle, a subscription "clothing-as-a-service" company, charging monthly fees of $69 to $160.  CaaStle rented the unsold inventory from brands and clothing stores such as Express, Ann Taylor, Ralph Lauren, American Eagle, and Bloomingdales through a subscription box service, handling the subscriptions, shipping, cleaning, and warehousing of the clothing.  The Company also offered its full-service platform to third-party retailers who paid CaaStle a fee to use CaaStle's technology, reverse logistics (shipping, cleaning), and infrastructure.  Hunsicker once claimed she could "maximize the profit earned on a piece of clothing."

78.     CaaStle's revenues were derived from platform member fees, rental subscription services, and sales of merchandise.  CaaStle claimed to "make money," as described in an overview deck, one of four ways: (1) the CaaS Network, where CaaStle charged the consumer a monthly subscription and shared the revenue with the participant; (2) CaaS Demand, where CaaStle charged the consumer a monthly subscription fee and paid the participant a commission; (3) CaaS Supply, where CaaStle charged the consumer a monthly subscription fee to access supply partners; and (4) CaaS Borrow, where CaaStle charged the consumer a usage fee and paid the brand per garment.

79.     In addition to its headquarters in New York, the Company had offices in California and distribution warehouses in Ohio and Arizona.  CaaStle also had a wholly owned subsidiary in New Delhi, India.

80.     CaaStle's Head of Finance, defendant Jain, was based in India, where he oversaw the Company's bookkeeping, accounting, financial planning, and treasury functions.  The Company's Financial Controller, who reported to Jain, was based in New York.

81.     CaaStle raised significant capital of approximately $530 million from investors over the years, including from Plaintiffs and other prominent investors, such as Bill Ackman, Henry Kravis, and Peter Thiel.  CaaStle's preferred stock was issued in Series A through A-12 at increasing values, with the last capital raise issuing stock having a conversion price of $6.20 per share.

82.     In 2019, CaaStle claimed to have $60 million in sales and over 100,000 customers.  Just four years later, Defendants claimed that the Company was making millions more, with 2023 revenue of $439.9 million and total profits of $66.3 million.  These representations were false.

83.     In reality, CaaStle only had subscribers in the mere hundreds, revenues of approximately $15 million, and was in severe financial distress.

84.     In late 2024, Jed Lenzner ("Lenzner"), who worked for a firm handling Henry Kravis's investments, found CaaStle's financial information questionable and called the Company's auditor listed on its financial statements, BDO, to inquire.  BDO told Lenzner that it had been relieved as auditor years prior.

85.     Lenzner went to CaaStle's Board with this information, after which Hennessy resigned from the Board and Singh re-joined the Board.  An investigation was purportedly launched and fraud was confirmed.  Nevertheless, even after the irregularities were brought to the

attention of the Board, Hunsicker remained as both CEO and a director, and reportedly continued fundraising until March 2025.

86.    Investors were kept in the dark regarding the purported discovery of the fraud for almost five months.

87.    Hunsicker formally resigned as CEO on March 24, 2025.

88.    On March 25, 2025, some investors received a phone call from Singh stating that the Board had discovered misrepresentations made by Hunsicker.

89.    On March 29, 2025, investors received a letter from CaaStle's Board stating that Hunsicker had resigned and stepped down from the Board because an internal investigation had found evidence of fraud.  The letter stated, in relevant part, that Hunsicker had "provided certain investors with misstated financial statements and falsified audit opinions, as well as capitalization information that understated the number of company shares outstanding" and that there was "a severe and immediate liquidity problem."

90.    The letter also informed investors that the Company was being investigated by law enforcement and that a "two-week Company furlough [would begin] next Monday."

91.    Attached to the shareholder letter were audited financial statements for 2023 and 2022, with Cerini & Associates ("Cerini") acting as the auditor.  Notably, the auditor's opinion was dated December 2, 2024, almost four months prior to investors being informed of any misconduct and during which time Hunsicker remained with the Company and continued fundraising.

92.    According to the audited financial statements, net revenues for 2023 and 2022 were only $15.7 million and $19.7 million, respectively, and net losses were $80.9 million and $55.2

million, respectively.  The Company's total current assets were $3 million for 2023 and 2022, and its cash was approximately $1 million and $750,000 for 2023 and 2022, respectively.

93.    The notes to the financial statements stressed CaaStle's severe liquidity issues, stating, in relevant part:

> The Company has incurred recurring operating losses since inception and had an accumulated deficit of $510,459,843 and $429,390,055 as of September 30, 2023 and 2022, respectively.  The Company plans to finance its operations and capital funding needs through equity and/or debt financing, as well as revenue from product sales.  However, there can be no assurance that additional funding will be available to the Company on acceptable terms on a timely basis.  The Company raised $50,276,926 from the issuance of 8,125,315 shares of Series A preferred stock during the year ended September 30, 2023.  If the Company is unable to obtain an adequate level of financing needed, the Company will need to curtail planned activities and reduce costs (see Note 8 for subsequent stock issuances).  Doing so will likely have an adverse effect on the Company's ability to execute its business plan.  These matters raise substantial doubt about the ability of the Company to continue as a going concern.

94.    On April 2, 2025, shareholders received another letter regarding "how CaaStle might re-structure in order to avoid a Chapter 7 bankruptcy and loss of shareholder value."  The letter detailed options such as "some sort of corporate merger, or partnership" or filing for Chapter 11.  To avoid Chapter 7, the Company claimed it required a bridge loan with a $3 million "funding commitment" by April 3, 2025, and asked those interested in contributing to contact the Company.

95.    On April 7, 2025, investors received notice that CaaStle had obtained $2.75 million in bridge financing from an investor affiliated with defendant Callon which would be used, in part, for the Chapter 11 process.

96.    On April 22, 2025, investors were informed that CaaStle hired Blacker as an independent director.  The letter noted that Blacker "brings extensive experience in corporate governance, restructuring, and strategic advisory roles."

97.    In addition to the fraudulent loss of the $530 million raised by investors, CaaStle is being sued by P180, a company initially owned by Brendan Hoffman and CaaStle, for fraudulently inducing P180 to raise capital and take out multiple loans.

98.    CaaStle filed the Bankruptcy Action on June 20, 2025.

99.    On June 27, 2025, CaaStle disclosed that in April 2025, Blacker was charged with, among other things, overseeing an investigation into the allegations against Hunsicker and any other claims and/or causes of action that CaaStle may have against its current and former officers, directors, or employees related to the misconduct allegedly committed by Hunsicker (the "Investigation").  CaaStle reported that based upon the Investigation, it believed it may have various claims and causes of action against current and former directors, officers, and employees, including, but not limited to, claims and causes of action based on breaches of fiduciary duty, fraudulent conveyance, and fraud.

100.    On July 17, 2025, an indictment was filed against Hunsicker charging her with wire fraud, securities fraud, money laundering, making false statements to a financial institution, and aggravated identity theft.[8]

101.    The SEC Action was filed on July 18, 2025, alleging violations of Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act of 1933.

## II.    The Hunsicker Conspiracy

102.    Hunsicker, Singh, Goldenberg, Jain, Callon, and other unknown conspirators sought to fraudulently garner investments from Plaintiffs for the benefit of the Hunsicker Conspiracy and to further the scheme to defraud investors.  The group had apparently worked together at various endeavors for years — including at and through other companies and

---

[8]  *United States v. Hunsicker*, Case No. 23-cr-318 (S.D.N.Y.).

ventures — and coordinated their activities across entities.  The Hunsicker Conspiracy's coherence was facilitated by the long relationship between the co-conspirators, forged at elite universities such as Princeton, Stanford, and other institutions.

103.    For example, Singh and Hunsicker collaborated across multiple years, as evidenced by Singh's periodic presence at CaaStle's offices in New York and regular communication with one or more Plaintiffs, and Singh and Hunsicker's meeting in November 2024 in the lead up to Hunsicker's "confession."    At times when Singh claims he had no official role at CaaStle, Defendants allowed him to use a CaaStle email address, holding him out as acting on CaaStle's behalf.

104.    While Hunsicker is the center of the association, she is not solely responsible for its operation or management.  Hunsicker, Singh, Goldenberg, Jain, and Callon have all acted for and on behalf of the Hunsicker Conspiracy for the purpose of perpetuating unlawful business practices.  Others may be involved as well.  At least since November 2024, one primary goal of the Hunsicker Conspiracy has been to cover up its other unlawful business practices at CaaStle.

105.    The central scheme of the Hunsicker Conspiracy regarding Plaintiffs was to continuously raise funds from investors under false pretenses to maintain the charade that CaaStle was a successful operating entity with projected success, when in truth it was just the opposite.

106.    After Hunsicker's fraud was revealed, she remained at CaaStle and continued communicating on behalf of the Company months into 2025 — even though she was supposed to have reduced her role.

107.    The "reduced role" was a scam that actually served to further the Hunsicker Conspiracy's control.  Hunsicker kept her office at CaaStle, and nothing about this "reduced role" was communicated to Plaintiffs.    And despite the supposed "reduced role," the Hunsicker

Conspiracy members who served on CaaStle's Board allowed Hunsicker to continue to raise capital and communicate on behalf of CaaStle, including regarding CaaStle's scale and capabilities, even though they knew such representations to be false.

108.    Members of the Hunsicker Conspiracy engaged in a variety of activities to further the fraudulent scheme.  Defendants participated in the management and coordination of the Hunsicker Conspiracy through individual acts of chargeable conduct as described below.  All Defendants conspired together for the benefit of the Hunsicker Conspiracy.

## III.    The Fraudulent Misstatements and Omissions

### A.    Investor Materials and Communications Were Materially False and Misleading

109.    Members of the Hunsicker Conspiracy engaged in multiple instances of fraud, among other things, in furtherance of their conspiracy to defraud Plaintiffs of their money and assets.  In substance, these lies primarily focused on inducing Plaintiffs to make and retain investments in CaaStle by providing fictional subscriber and revenue numbers that gave the illusion of a legitimate, successful business enterprise.  Hunsicker, Singh, Goldenberg, Jain, Callon, and other unknown conspirators worked together to falsify corporate documents, pitch decks, fundraising information, income statements, subscription numbers, customer numbers, partnership agreements, and other financial statements and information.  The following paragraphs include *representative* examples of the Hunsicker Conspiracy's fraudulent statements.

110.    On April 17, 2020, plaintiff Aaron reached out to Hunsicker to ask "how things were going[.]"  Hunsicker responded on April 19, 2020:

> So far, so good.  Pipeline is accelerating dramatically – retailers know they have to have a value offering for the consumer coming out of this, and rental is a great option for them.  And we have plenty of cash in the bank, which is always nice.

111.    On November 16, 2021, Hunsicker sent an email to plaintiff Beck with an offer to purchase A-12 shares, claiming that CaaStle was "up to over 45 clients" and that the "subscriber base ha[d] doubled since the beginning of the year[.]"  Beck purchased additional shares just three days later, in reliance on these assertions, as detailed above at ¶ 31.

112.    On August 9, 2022, Hunsicker sent the Ananta Group a slide deck disclosing details of a licensing deal opportunity with "POM."  The deck proposed that POM would "launch[] a[] new offer with Branded Affiliates using CaaStle's technology" and forecasted that for every 250 Branded Affiliates launched, "~$100M in annual revenue" and "~$45M in Gross Profit" would be generated.  The deck also forecasted that "Cash and EBITDA profitability can be achieved quickly" and a "3x" stock price increase would result, as a "conservative estimate[.]"  Three days later, in reliance on this update, the Ananta Group purchased additional CaaStle shares as detailed above at ¶¶ 30, 52.

113.    On February 13, 2023, Hunsicker sent plaintiff Crnkovic an email with an attachment that purported to represent the Company's earnings for the fourth quarter of fiscal year 2022.  Additionally, in the body of the email, Hunsicker told Crnkovic that CaaStle had achieved revenue of "about $275M for the year and started making positive cash flow by the end of the year."  She also told Crnkovic that the Company had "about $50M in the bank" and that she did not "foresee having to raise any more financing."  Hunsicker continued:

> We continue to sign up Creators / Influencers / Branded Affiliates.  Our goal for 2022 was 100 and we signed over 350.  We are aiming for 1,500 this year and are currently well ahead of plan.  *These Branded Affiliates should add about $150-200M in revenue in 2023.*

(Emphasis added).

114.    Subsequently, on February 20, 2023, Hunsicker emailed Crnkovic again and told him that the Company was "on pace for $500M this year in rev[enue] and $75M in [cash]."

Crnkovic purchased additional CaaStle securities through Sretno just three days later, in reliance on these assertions, as detailed above at ¶ 55.

115.    Hunsicker emailed Crnkovic again on July 16, 2023, representing that the Company had "signed over 1,000 creators to [its] platform, which [was] driving profitable growth[.]"

116.    Many other instances of fraud were committed.  The Hunsicker Conspiracy ensured that outsiders did not have complete information regarding CaaStle's true number of subscribers, the size of its operation, and its revenue.  Instead, multiple times throughout CaaStle's history, they made statements or took actions, over phone lines or video conference, and in in person meetings, to give the impression that CaaStle was a large, successful company with extensive operations. The goal was to create an image for CaaStle that would head off any questions regarding actual performance, operations, subscribers, or revenue.  In other words, if CaaStle was so successful, why would anyone need these details?  When investors did press for more details, the Hunsicker Conspiracy invented excuses for not providing them, citing concerns about confidentiality and reassuring smaller investors that while they were not entitled to such details, larger investors were receiving the requested information.  When investors expressed beliefs regarding CaaStle's scale, subscribers, and revenue, members of the Hunsicker Conspiracy remained silent and therefore concealed the truth, leading to half-truths and the implied truth of these (ultimately false) facts.

117.    The overarching goal of this scheme was clear: to obtain further funds from investors in furtherance of the Hunsicker Conspiracy's unlawful business activities.

118.    Additionally, false statements or omissions were later made to cover up and perpetuate the Hunsicker Conspiracy's unlawful activities in 2025.  The falsification of records was disclosed to the entire CaaStle Board in or around November 2024.  At least from November 2024 through March 2025, Plaintiffs believe that members of the Hunsicker Conspiracy conspired

to have Hunsicker continue to lead and be involved in CaaStle's affairs, despite learning of the fraudulent conduct.  The Hunsicker Conspiracy then conspired to prevent investors from learning the truth about CaaStle.

119.    In doing so, the Hunsicker Conspiracy committed numerous other instances of fraud through misstatements and/or omissions.

120.    For instance, on or around December 6, 2024, Hunsicker emailed a slide deck to the Ananta Group providing an overview of CaaStle's business and details on the Company's partnerships with P180 and retailers.  The deck included an income statement for the first three quarters of fiscal year 2024, which represented that CaaStle had generated $189,386,990 of revenue in the first quarter, $209,080,725 of revenue in the second quarter, and $227,130,936 of revenue in the third quarter.  The slide deck also included a balance sheet as of September 2024, which represented that CaaStle had $276,207,282 in cash and $294,525,713 in total assets.  This information was false.

121.    The statements expose the Hunsicker Conspiracy's intent, known to Singh, Callon, Hunsicker, Jain, and Goldenberg since at least November 2024, to conceal CaaStle's insolvency and fraud.

122.    Hunsicker, Singh, Goldenberg, Jain, Callon, and perhaps others, also conspired to prevent disclosure of the fraud at CaaStle for a long time before November 2024 and committed further chargeable acts of fraud in furtherance of that conspiracy.

123.    Callon's international reputation for corporate governance expertise, as mentioned above, lent credibility to the endeavor, helping to keep the truth from coming out until months after Hunsicker "confessed."

124. As detailed in the following paragraphs, the Hunsicker Conspiracy, acting through Hunsicker, disseminated false financial reports to investors virtually at all times since CaaStle's fundraising began.

125. For example, in 2019, Hunsicker provided CaaStle financials to certain Plaintiffs for the Company's fiscal year ended September 30, 2018 ("FY 2018"). These financials stated that CaaStle's revenue for FY 2018 totaled $71.5 million and operating losses totaled $24.1 million, among other things. The Hunsicker Conspiracy Defendants knew or were reckless in not knowing that these statements were false and misleading because internal Company records as of early 2019 showed FY 2018 revenue of only $23.4 million and operating losses of $46.6 million, and audited financial statements later provided in early 2020 reflected revenue of $24.9 million and operating losses of $53.6 million.

126. On August 10, 2019, defendant Hunsicker emailed the GB Group a purported income statement for the second quarter of fiscal year 2019 and a purported balance sheet as of the end of June 2019. These financials represented that CaaStle had generated $22,152,888 in revenue and an operating loss of $7,077,839 in the second quarter of 2019 and had $44,198,164 in total assets and $31,282,055 in cash as of the end of June 2019.

127. In 2020, Hunsicker provided CaaStle financials to certain Plaintiffs for the Company's fiscal year ended September 30, 2019 ("FY 2019"). These financials stated that CaaStle's revenue for FY 2019 totaled $89.8 million and operating losses totaled $27.7 million, among other things. The Hunsicker Conspiracy Defendants knew or were reckless in not knowing that these statements were false and misleading because internal Company records as of late 2019 showed FY 2019 revenue of only $27.7 million and operating losses of $54.4 million, and the

audited financial statements provided to Defendants in August 2020 reflected revenue of $26 million and operating losses of $58.2 million for FY 2019.

128.   In 2021, Hunsicker provided CaaStle financials to certain Plaintiffs for the Company's fiscal year ended September 30, 2020 ("FY 2020").  Other investors, including the Ananta Group and Winter, received purportedly audited financials for the years ended September 30, 2020 and 2021 that reported net revenues of $90 million and $120.5 million, respectively, and a net loss of $29.6 million and $33.7 million, respectively.  Cash and cash equivalents were reported to be $32.2 million and $30.2 million, respectively.  The combined audited financial statements for 2020 and 2021 were purportedly audited by BDO with the auditor's report dated March 26, 2023.

129.   The Hunsicker Conspiracy Defendants knew or were reckless in not knowing that these statements were false and misleading because internal Company records as of late 2020 showed FY 2020 revenue of only $24.7 million and operating losses of $42.6 million, and the audited financial statements provided to Defendants in May 2021 reflected revenue of $25 million and operating losses of $45.3 million for FY 2020.

130.   According to the SEC Action complaint, around November 30, 2022, Hunsicker requested from her finance team a non-final draft of the Company's audited financial statements for the fiscal year ended September 30, 2021 ("FY 2021").  Hunsicker then altered the numbers and provided the financials to investors, including certain Plaintiffs.  Hunsicker also removed the auditor's going concern opinion and then inserted BDO's signature.

131.   These financials stated that CaaStle's revenue for FY 2021 totaled $120.5 million, operating losses totaled $33.7 million and showed a cash balance of $30.2 million.  Those financials provided to Plaintiffs were materially false and misleading.  Audited financial statements

provided to Defendants in February 2022 reflected revenue of $18.6 million and operating losses of $32.3 million for FY 2021.  The Hunsicker Conspiracy Defendants knew or were reckless or negligent in not knowing that the financials provided to Plaintiffs were materially false and misleading because the audited financial statements in February 2022 reflected different information and the versions Hunsicker created were false.

132.    According to the SEC Action complaint, in March 2023, Hunsicker announced that the Company had become cash flow positive as of the quarter ending December 31, 2022, and provided an interim financial statement showing a profit.  Hunsicker once again created false audited financial statements without any reference to the Company continuing as a going concern and added the auditor's signature for the fiscal year ended September 30, 2022 ("FY 2022") and began providing them to investors in April 2023.  These financials stated that CaaStle's revenue for FY 2022 totaled $238.5 million, operating losses totaled $17.1 million and showed a cash balance of $42.5 million.

133.    On November 8, 2022, Hunsicker sent the Ananta Group an end of fiscal year 2022 balance sheet and third quarter income statement.  The balance sheet represented that CaaStle had $43,784,391 in cash and $56,132,423 in total assets, while the income statement represented that CaaStle had generated $77,007,659 of revenue in the third quarter of 2022.  Ananta Group members Ananda OM and Shanti Exempt purchased additional CaaStle securities just six days later, on November 14, 2022, in reliance on these representations, as detailed above in ¶¶ 29, 51 and below in ¶¶ 155, 176.

134.    Those financials provided to Plaintiffs were materially false and misleading. Internal Company records showed FY 2022 revenue of only $20 million, operating losses of $34.1 million, net losses of $50 million, and a cash balance of $621,000.  Audited financial statements

completed on December 2, 2024, by Cerini reported FY 2022 revenue of $19.7 million, operating losses of $58.5 million, and a cash balance of less than $750,000.

135.    The Hunsicker Conspiracy Defendants knew or were reckless or negligent in not knowing that the financials provided to Plaintiffs were materially false and misleading because internal Company records reflected different information.  In addition, the Hunsicker Conspiracy Defendants knew that the Company was experiencing a cash crunch and told BDO to stop working on the audit in September 2023.

136.    In 2024, Hunsicker provided CaaStle financials to certain Plaintiffs for the Company's fiscal year ended September 30, 2023 ("FY 2023").  These financials stated that CaaStle's revenue for FY 2023 totaled $439.9 million, total profit of $66.3 million, and a cash balance of $112.8 million, among other things.

137.    Those financials provided to Plaintiffs were materially false and misleading. Internal Company records showed FY 2023 revenue of only $15.6 million, operating losses of $39.6 million, net losses of $47.2 million, and a cash balance of $880,000.  When Cerini finally finished its audit on December 2, 2024, the audited financial statements reported revenue of $15.7 million, operating losses of $80.7 million, and a cash balance of less than $950,000.

138.    On August 31, 2023, Hunsicker emailed the GB Group purported financials for the first half of 2023, which showed $95,987,458 in revenue in the first quarter of 2023 and $114,543,282 in revenue in the second quarter of 2023.  GB Group members K. Isaacs, Y. Isaacs, and Silver purchased additional CaaStle securities the following day in reliance on these representations, as detailed above in ¶¶ 37, 38, 53 and below in ¶ 220.

139.    On October 16, 2023, Silver met personally with Callon in Callon's offices in Tokyo.  Callon reassured Silver regarding CaaStle's operations and said that the only thing he used

to worry about with CaaStle was their running out of money, and he was so pleased that the Company had become profitable and cash-flow positive, so that he was no longer concerned it would run out of money. Callon also discussed his involvement in the Japanese business community and efforts to improve corporate governance in Japan.

140. On November 30, 2023, Hunsicker emailed plaintiff Crnkovic regarding a secondary sale, stating therein that the Company was "generating cash" and profits were expected to be "about $85M" with "$500M of revenue." The same day, she emailed plaintiff Beck stating that profit for the year would be about "$75M . . . on $500M of revenue."

141. During an investor call in December 2023, Hunsicker stated that CaaStle's revenue was $521 million. On the call, in response to an investor's question about the Company's valuation, Hunsicker responded: "Take the revenue and multiple it by seven."

142. On February 16, 2024, Hunsicker emailed the GB Group a purported income statement and balance sheet for fiscal year 2023. The balance sheet represented that CaaStle had $134,918,532 in cash as of the end of December 2023 and $151,316,743 in total assets. The income statement represented that CaaStle had generated $95,987,458 in revenue and had an operating profit of $10,555,651 in the first quarter of 2023, generated $114,543,282 in revenue and had an operating profit of $25,156,486 in the second quarter of 2023, generated $143,540,315 in revenue and had an operating profit of $33,054,924 in the third quarter of 2023, and generated $165,346,810 in revenue and had an operating profit of $23,200,990 in the fourth quarter of 2023.

143. On August 5, 2024, Hunsicker sent the Ananta Group financials for the first quarter of fiscal year 2024, along with the following message:

We're ahead by a decent amount for the year already.

P180 Deals:

- Finalizing deal docs with luxury brand.  We see huge potential in this brand - they have a large amount of latent demand on ecomm that they weren't aware of.

- Finalizing deal docs with hot British brand.  We'll own their US ops.

- Finalizing term sheet with advanced contemporary brand that is cash constrained. Perfect assortment for rental, founder is super smart and a pleasure to work with.

- Discussing terms w/ small luxury brand.  Really, really high-end clothing.

- Exploring buying a portfolio of contemporary brands that are owned by a PE firm. We like the brands quite a bit, the revenue is quite high, but we're dancing with the PE firm.

- 5 others in pitch stage...

We are killing it and we LOVE the brands.

Christine

144.    The income statement attached to this email represented that CaaStle had generated $189,386,990 of revenue in the first quarter of 2024 and had an operating profit of $42,375,959. The attached balance sheet represented that the Company had $178,257,503 in cash and total assets of $194,517,717 as of the end of March 2024.

145.    On August 22, 2024, Hunsicker sent the Ananta Group and other investors financials for the second quarter of fiscal year 2024.  The income statement showed revenues of $189.4 million and $209.1 million, respectively, and operating profit of $42.4 million and $48.6 million, respectively.  The attached balance sheet represented that the Company had $227,177,895 in cash and total assets of $243,920,616 as of the end of June 2024.

146.    Plaintiff Beck spoke with Hunsicker on May 7, 2024, and was told that revenues were around $520 million with $90 million in cash flow and 90% year-over-year growth in 2023.

147.    On November 12, 2024, plaintiffs Beck and Crnkovic received financial information for the first three quarters of 2024, reiterating the above information and stating that for the third quarter revenue was $227.1 million and operating profit of $52.7 million.

148.    For 2024 and 2025, revenue projections were $793 million and approximately $1 billion, respectively.

149.    The Hunsicker Conspiracy Defendants knew or were reckless or negligent in not knowing that the financials provided to Plaintiffs were materially false and misleading because CaaStle's internal records showed otherwise, and CaaStle's auditor had not completed the audit.

150.    Based upon the forgoing conduct, there is little doubt that the information provided to Plaintiffs beginning as early as when Hunsicker first began raising money from Plaintiffs was materially false and misleading, overstating performance results and opportunities at all times, when CaaStle's records showed otherwise.

**B.    CaaStle's Secondary Sales Were a Charade and Investors Were Provided with False and Misleading Capitalization Information**

151.    Beginning in late 2021, Hunsicker began telling investors that the Company was nearing completion of its capital-raising rounds and that by mid-2022, there may not be any further capital raises.  On July 26, 2022, she told Crnkovic that she did not "believe [CaaStle would] need to [do] another raise" because the Company was "so close to generating cash."  Indeed, the 2022-2023 audit report provided to investors showed that no capital had been raised since the end of FY 2022.

152.    Unbeknownst to investors, CaaStle continued to rely on capital raises to continue its operations.  Instead of informing investors of this fact, the Hunsicker Conspiracy Defendants falsely claimed that they were offering secondary sales — resales from current investors who wanted to sell their shares.  Specifically, the Hunsicker Conspiracy Defendants offered steep "discounts" on the Company's stock, accompanied by false tales of investors who needed to liquidate their CaaStle investments quickly.

153.    For example, on May 19, 2022, Hunsicker sent the following email to the Ananta

Group:

> An opportunity has popped up to pick up some hugely discounted preferred shares.
> If you have 5 mins today / tomorrow, let me know and I can explain by phone.  Give
> me a buzz if you're free. []
>
> Christine

154.    On June 21, 2022, Hunsicker sent Crnkovic the following email:

> Wanted to run something by you given that I believe valuation was a concern when
> you were considering your pro rata.  An investor of ours died a few years ago and
> his estate defaulted on a bank loan he had taken out before he passed (it's a whole
> saga).  The bank contacted me to see if we could help move his stock quickly so
> that some of the loan could be repaid.  It's a huge discount - 60% off the last round
> (which is a 3x multiple on today's ARR).  To take the whole block, it would be
> $800K ($2.0M worth at the previous valuation).  We would do the transaction so
> that you wouldn't have to deal with the bank at all or the estate.  You'd buy from
> CaaStle and we'd buy back from bank.  Any interest?  If I could take it, I would,
> but our lawyer says I'm not allowed.

155.    On November 10, 2022, Hunsicker sent the Ananta Group the following email,

referencing another false story about a cash-strapped investor:

> Hi Kris,
>
> So psyched you can take the whole chunk!
>
> Attached are docs (same as before). The breakdown is:
>
> 1,442,310 shares for $1,500,003.20
> 241,936 A-12 shares @ $6.20 for $1,500,003.20
> 1,200,374 warrants @ $0.00 for $0.00
>
> *Obviously, he's in a huge cash crunch, so the faster the better.* :-)
>
> Christine

(Emphasis added).  These shares were ultimately purchased by Ananda OM and Shanti Exempt on

November 14, 2022, as detailed above in ¶¶ 29 and 51.

156.    On January 30, 2023, Hunsicker sent plaintiff Crnkovic the following email:

> Hi Cedo,

Just checking in because I ran this by you last time - an investor who I thought needed liquidity in December held off selling his CaaStle shares as he was hoping another one of his companies would be sold. That didn't happen so his 300k is back on the market. At this point, it's less than a 1x revenue valuation, so it's a great deal after we crushed 2022.

Making progress on RTR. Over 400 Branded Affiliates signed. Doing a tech partnership w a resale platform. Expanding like crazy.

Let me know!

Christine

Crnkovic ultimately purchased these shares on February 23, 2023, through Sretno, as detailed above in ¶ 55.

157.    On February 27, 2023, Hunsicker emailed plaintiff Aaron that she had "$200K of very cheap stock" and "wanted to see if [he]'d like to buy it." She informed Aaron that he could purchase the stock "directly from CaaStle" for "only $1.00 per share (early investor that has major liquidity issue), which is an +80% discount" but would "need to move quickly, as in the next day or two." Hunsicker clarified that Aaron and one of his colleagues could each receive "17k preferred and 83k common [shares] via" warrants to purchase. Aaron responded: "By the way, who chose the price and why so distressed? It still seems too good to be true[.]" Hunsicker responded:

:-). It's not to [sic] good to be true. It's just good.

I asked him how low he would go bc I needed an extremely low price to move in 1-2 days.

He got it at a lower rate so he still made money. But when the s&@t hits the fan, cash in hand is worth a lot.

(Also, he was buying stocks in public and private deals on margin and the margin got called)

Aaron purchased these shares on February 28, 2023, as detailed above in ¶ 27.

158.     Hunsicker emailed plaintiff Beck on July 19, 2023, stating that an investor needed to sell 385,000 shares due to "elder care issues."  Beck purchased additional shares two days later, on July 21, 2023, as detailed above in ¶ 31.  On November 30, 2023, Hunsicker emailed plaintiffs Beck and Crnkovic regarding the same investor, stating that he needed "to move another small chunk" to help with his mother's care.

159.     Hunsicker reached out to plaintiff Aaron again on September 8, 2023, informing him that she had "a tiny bit of cheap cheap stock from an employee who needs to quickly find elder care" and asking if he or his team wanted it.  She explained that "it's less than a 1x rev multiple, but needs to move today if possibly [sic]."  Hunsicker stated that the offer was for "[$]150k worth [of stock] at a [$]220M valuation (we're on track for $500 this year and [$]75M of cash)[.]"  In response, Aaron requested "audited financials" for 2022.  Hunsicker informed him that she only had audited financials for 2021 but would "have 2022 audit soon" and that "[t]here were no material changes from the internal numbers."  Aaron requested that she send the 2021 financials to him and asked whether CaaStle was "not allowed" to purchase the stock themselves. Hunsicker confirmed that the Company could not purchase the stock and did not "want to get into loaning money (messy)[.]"  Hunsicker then asked whether Aaron could "wire [] [$]50k today" because the employee "need[ed] to make some payments for his mom[.]"  Aaron clarified that he was "going to do 75," and was waiting to hear whether his colleague was also interested in purchasing the stock.  Aaron purchased these shares on September 11, 2023, as detailed above in ¶ 27.

160.     On November 30, 2023, Hunsicker emailed Crnkovic the following message:

Hi Cedo,

Hope you are doing well!

Quick update: CaaStle is doing extremely well and is generating cash. *We should make about $85M of profit this year on $500M of revenue.* Starting to talk with some bankers about monetization strategies so that we can return capital to investors in the next 12ish months.

The reason for this reach out: The same investor you bought from in the summer needs to move another small chunk. He is looking to raise $300k very quickly, so he's pricing it at $0.75 per share and selling 400,000 shares (which is less than 1x 2023 revenues and very cheap). Since you bought a piece this summer, I figured I'd offer it to you first.

I would buy it in a heartbeat if I could, but unfortunately I'm not allowed to given I'm a Board Director and officer.

Let me know if you'd like it!

Best

Christine

(Emphasis added). Crnkovic responded: "Thanks for checking. I'll pass."

161.    On January 26, 2024, Hunsicker emailed at least plaintiffs Beck and Crnkovic offering a resale of shares.

162.    Plaintiffs would not have invested in these secondary sales had they known they were purchasing primary capital raises.

163.    According to the SEC Action complaint, CaaStle's records show Hunsicker as being the only selling shareholder for secondary sales between December 2021 and July 2023, redeeming approximately 675,000 shares at $6.20 per share, or more than $4 million.

164.    To deceive investors about the secondary sales, Plaintiffs and other investors were provided with false and misleading capitalization tables which represented share levels as remaining flat.

165.    According to the SEC Action complaint, the Company records reflected capital raises through the sale of 100 million newly issued shares from January 2022 through December 2024, which caused CaaStle to exceed the number of authorized share totals in 2023. Defendants

retroactively increased the number of authorized shares of common stock from 255 million to 350 million and the number of shares of preferred stock from 136,100,000 to 152,850,000 to cover the excess sales.

## IV.    The Hunsicker Conspiracy Defendants Participated In and Had Actual Knowledge of the Fraud

166.    Defendant Singh was actively involved with fundraising, sending numerous emails and text messages with investor materials, financial updates, and new investment opportunities to, at a minimum, plaintiff Jayant between 2015 and 2021, to plaintiff Beck between 2014 and 2022, and to plaintiff KCP Capital between at least 2015 and 2017.

167.    Defendant Singh was also involved in decisions about the audited financial statements, informing certain plaintiffs that the 2015 audit would only be performed on the balance sheet and not the income statement or statement of cash flows because of the "prohibitive cost."

168.    While in possession of material information regarding CaaStle's true affairs, defendants Hunsicker and Singh made a profit through sales of their shares to investors.  In early 2018, while claiming a valuation of $5.25 per share, they sold shares to investors at $4.65 per share.  At a minimum, plaintiff Beck purchased some of these shares.

169.    While in possession of material information regarding CaaStle's true affairs, defendants Singh and Goldenberg made a profit through share redemptions or buybacks. According to documents filed in the Bankruptcy Action, on October 11, 2024, Singh redeemed shares totaling $6 million.   On November 8, 2024, Goldenberg redeemed shares totaling $2,999,000.

170.    Hunsicker and Goldenberg also received large salary payments shortly before CaaStle filed for bankruptcy, with Hunsicker receiving $416,667 for June 1, 2024 through May 31, 2025, and Goldenberg receiving $586,364 for June 1, 2024 through June 20, 2025.

**V.      Plaintiffs Learn of the Fraud**

171.    Plaintiffs did not discover, nor could they reasonably have discovered, Defendants' fraud until March 25, 2025, for those who received a call from Singh, and/or March 29, 2025, when the fraud was revealed in a letter to investors from CaaStle's Board.

**VI.     Additional Reliance Allegations**

172.    As alleged herein, each of the Plaintiffs relied on Defendants for assurance that the representations they received about, *inter alia*, CaaStle's operations, subscriber numbers, and financials were fairly stated in either (1) making their investments, whether a first-time investment or a follow-on investment, and/or (2) in continuing to hold their investments.  Plaintiffs also relied upon the purportedly audited financial statements in making their respective investments and in continuing to hold those investments.

173.    Prior to plaintiff Aaron's first investment in the Company on or around February 21, 2020 of $150,000, Aaron was provided with false and misleading information regarding CaaStle, including, on or around October 24, 2019, a falsified balance sheet, income statements for the prior three years, and projections for the next 3 to 5 years.  Aaron would not have made this investment if Defendants had revealed the true state of affairs at CaaStle in the representations he received at that time.

174.    Plaintiff Aaron made additional investments on or around August 4, 2021, February 28, 2023, and September 11, 2023, and continued to hold his investments, in reliance on additional false and misleading information regarding CaaStle, such as defendant Hunsicker's representation: (i) on April 19, 2020, that CaaStle's "pipeline" was "accelerating dramatically" and that the Company had "plenty of cash in the bank"; (ii) on February 27, 2023, that she had "$200K of very cheap stock" from an "early investor that has [a] major liquidity issue" because he had been

"buying stocks in public and private deals on margin and the margin got called"; and (iii) on September 8, 2023, that she had "a tiny bit of cheap cheap stock from an employee who needs to quickly find elder care[,]" and that CaaStle was "on track" for $500 million in revenue and $75 million in cash in 2023.  Plaintiff Aaron continued to hold these investments since late 2023 in reliance on the false and misleading information he received regarding CaaStle.  Aaron would not have made these investments and/or would have exited his investments and/or pursued equitable or legal remedies if Defendants had revealed the true state of affairs at CaaStle in the representations he received at that time.

175.    The Ananta Group made their first investments in the Company on May 17, 2016, when plaintiff Ananta-OM Foundation invested $4,999,999.50, plaintiff Shanti invested $1,999,998, and plaintiff Shanti Exempt invested $2,999,997.  The Ananta Group made additional investments on September 1, 2017 (Ananda OM in the amount of $3,086,610.12 and Shanti in the amount of $1,913,388.40), October 23, 2017 (Shanti Exempt in the amount of $1,969,975.80), January 7, 2019 (Ananda OM in the amount of $884,970.85), April 5, 2019 (Ananda OM in the amount of $3,469,997.90), February 12, 2020 (Shanti Exempt in the amount of $1,062,432), and December 21, 2021 (Ananda OM in the amount of $1,239,367.60).

176.    Following these investments, the Ananta Group received false and misleading information regarding CaaStle, such as: (i) a May 19, 2022 email from Hunsicker offering "[a]n opportunity . . . to pick up some hugely discounted preferred shares"; (ii) an August 9, 2022 email from Hunsicker containing a slide deck disclosing details of a licensing deal opportunity with a company called "POM," which proposed that POM would "launch[] a[] new offer with Branded Affiliates using CaaStle's technology" and forecasted that for every 250 Branded Affiliates launched, "~$100M in annual revenue" and "~$45M in Gross Profit" would be generated, while

"Cash and EBITDA profitability [would] be achieved quickly" and a "3x" stock price increase would result, as a "conservative estimate"; (iii) a purported end of fiscal year 2022 balance sheet and third quarter income statement sent by defendant Hunsicker on November 8, 2022, which represented that CaaStle had $43,784,391 in cash, $56,132,423 in total assets, and had generated $77,007,659 in the third quarter of 2022; and (iv) a November 10, 2022 email from Hunsicker concerning another discounted share repurchase opportunity from an investor who was in "a huge cash crunch, so the faster the better."  The Ananta Group continued to hold their investments, and made additional investments, in reliance on this false and misleading information.  Specifically, Ananda OM invested another $706,025 on May 24, 2022, $417,588.60 on August 12, 2022, $337,500 on September 14, 2022, $450,002.20 on September 27, 2022, $1,000,005.20 on November 14, 2022, and $250,002.60 on January 27, 2023.  Ananta-OM Foundation invested another $232,611.60 on or around August 12, 2022.  Nyzio made his first investment in the Company on or around May 25, 2022, in the amount of $99,975.  Shanti Exempt invested another $499,999 on or around November 14, 2022.  Shanti Non Exempt made its first investment in the Company on or around August 12, 2022, in the amount of $311,804.20, and made another investment of $250,002.60 on or around January 27, 2023.  The Ananta Group would not have made these investments and/or would have exited their earlier investments and/or pursued equitable or legal remedies, if Defendants had revealed the true state of affairs at CaaStle in the representations the Ananta Group received at those times.

177.    The Ananta Group received additional false and misleading information regarding CaaStle in 2023 and 2024, such as: (i) a June 12, 2023 email from Hunsicker containing purported 2022 quarterly financials, 2023 YTD financials, and audited financials for FY 2021 and FY 2020 (see ¶¶ 128-31), which represented that CaaStle had generated $52,448,873 of revenue and a

$3,754,791 operating loss in the first quarter of 2022, $62,893,465 of revenue and a $3,087,734 operating loss in the second quarter of 2022, $77,007,660 of revenue and a $36,010 operating loss in the third quarter of 2022, $85,781,771 of revenue and a $5,954,300 operating profit in the fourth quarter of 2022, $95,987,458 in revenue and a $10,555,651 operating profit in the first quarter of 2023, and $114,543,282 in revenue and a $23,782,653 operating profit in the second quarter of 2023; (ii) an August 5, 2024 email from Hunsicker, representing that CaaStle was "ahead by a decent amount for the year already" and containing purported financials for the first quarter of 2024, which represented that CaaStle had generated $189,386,990 of revenue and an operating profit of $42,375,959, and had $178,257,503 in cash and total assets of $194,517,717 as of the end of March 2024; (iii) an August 22, 2024 email from Hunsicker containing purported financials for the second quarter of 2024, which represented that CaaStle had generated $209,080,725 in revenue and an operating profit of $48,620,516, and had $227,177,895 in cash and total assets of $243,920,616 as of the end of June 2024; and (iv) a December 6, 2024 email from Hunsicker containing purported financials for the first three quarters of 2024, which represented that CaaStle had generated $189,386,990 of revenue in the first quarter of 2024, $209,080,725 of revenue in the second quarter of 2024, and $227,130,936 of revenue in the third quarter, and had $276,207,282 in cash and $294,525,713 in total assets as of September 2024.

178.    In reliance on the false and misleading information they received in 2023 and 2024, as well as the false and misleading information they had received earlier, members of the Ananta Group made additional investments in the Company.  On or around August 18, 2023, plaintiff Ananta-OM Foundation invested another $450,000, plaintiff Nyzio invested another $25,004.60, and plaintiff Shanti Non Exempt invested another $475,000.60.  The Ananta Group would not have made these investments and/or would have exited their investments and/or pursued equitable

or legal remedies, if Defendants had revealed the true state of affairs at CaaStle in the representations they received at those times.

179.    Plaintiff Beck made his first investment in the Company on or around March 25, 2014, in the amount of $1,000,000.  Plaintiff Beck made additional investments on or around November 7, 2014 for $250,000, April 7, 2015 for $750,000, July 7, 2016 for $1,000,000, September 1, 2016 for $316,055, September 9, 2016 for $47,762, and June 26, 2017 for $1,250, and continued to hold his investments, in reliance on false and misleading information regarding CaaStle, such as: (i) an update from Hunsicker sent on August 9, 2014, representing that CaaStle had "over 15,000 members"; (ii) a December 21, 2015 email from Hunsicker and Singh stating that one of the Company's "older individual investors has a liquidity issue and needs liquidity on a part of their investment" and offering shares at "a (blended) ~15% discount" from the prior round of financing; and (iii) a February 11, 2017 email from Singh representing that the Company would be "profitable" if it did "not invest in growth[.]"  Beck would not have made these investments and/or would have exited his investments and/or pursued equitable or legal remedies, if Defendants had revealed the true state of affairs at CaaStle in the representations he received at those times.

180.    Plaintiff Beck made further investments on or around February 5, 2018 for $249,998, January 10, 2019 for $250,000, November 19, 2021 for $867,206, and July 21, 2023 for $250,000, and continued to hold his investments, in reliance on additional false and misleading statements regarding CaaStle, such as: (i) emails with defendant Singh between January 14, 2018 and February 3, 2018, discussing an opportunity to purchase discounted shares from Singh; (ii) a November 16, 2021 email from Hunsicker representing that CaaStle was "up to over 45 clients" and that the "subscriber base ha[d] doubled since the beginning of the year" and offering a resale of shares; (iii) an August 25, 2022 email offering "EXCEPTIONALLY cheap shares" at a roughly

70% discount to the prior round than "an investor that is in quite a pickle" needed to "offload asap"; (iv) a follow up email on September 12, 2022, offering a further discount on the August 25, 2022 opportunity; (v) a December 8, 2022 email from Hunsicker offering an opportunity "to pick up some super cheap shares" from an investor who was "in a bad place"; (vi) a January 30, 2023 email again offering discounted shares from the same purported investor; and (vii) a July 19, 2023 email from Hunsicker offering a discounted resale of shares from an investor having "elder care issues[.]"  Beck would not have made these investments and/or would have exited his investments and/or pursued equitable or legal remedies, if Defendants had revealed the true state of affairs at CaaStle in the representations he received at those times.

181.    Plaintiff Beck received additional false and misleading information regarding CaaStle after his last investment in mid-2023, such as: (i) a November 30, 2023 email from Hunsicker projecting "about $75M of profit this year on $500M of revenue" and offering a discounted resale of shares from an investor whose "mom's care has been more expensive than he thought it would be given the amount of therapy she has needed"; (ii) a January 26, 2024 email again offering a discounted resale of shares; (iii) statements made by Hunsicker on a May 7, 2024 investor call, including that the Company had generated roughly $520,000,000 in revenue in 2023 and about $90,000,000 in cash; and (iv) a slide deck sent by Hunsicker on November 12, 2024, showing revenue of $189,386,990 and an operating profit of $42,375,959 for the first quarter of 2024, revenue of $209,080,725 and an operating profit of $48,620,516 for the second quarter of 2024, revenue of $227,130,936 and an operating profit of $52,723,501 for the third quarter of 2024, and total assets of $294,525,713 and cash of $276,207,282 as of the end of September 2024. If the true state of affairs had been revealed at any point during that time, Beck would have exited his investments and/or pursued equitable or legal remedies.

182.    Plaintiff Crnkovic made his first investment in the Company on or around December 20, 2013, in the amount of $499,999.77.  Crnkovic made additional investments on or around March 16, 2014 for $199,999.28, and March 7, 2019 for $499,998.05, and continued to hold his investments, in reliance on false and misleading information regarding CaaStle, such as: (i) a February 19, 2014 email from Singh representing that the Company had a "run rate" of "about 6.5M" and "close to 8K" subscribers; (ii) an August 14, 2014 email from Hunsicker representing that the Company had "over 15,000 members" and was "growing at an average of 20-25% month over month"; (iii) an August 23, 2015 update from Hunsicker and Singh stating that in the prior month "[g]uests" on the Company's platform had "exceeded 1M, and 12-14% of those convert to members over time"; (iv) a December 21, 2015 email from Hunsicker and Singh stating that one of the Company's "older individual investors has a liquidity issue and needs liquidity on a part of their investment" and offering shares at "a (blended) ~15% discount" from the prior round of financing; (v) a February 11, 2017 email from Singh representing that the Company "would be profitable" if it chose "to not invest in growth"; and (vi) a March 1, 2019 email from Hunsicker containing a forecast for CaaStle that projected total revenue over the next twelve months of $90,900,000, $250,200,000 over the next twenty four months, $622,800,000 over the next thirty six months, $1,423,012,500 over the next forty eight months, and $3,044,081,250 over the next sixty months.  Crnkovic would not have made these investments and/or would have exited the investments and/or pursued equitable or legal remedies, if Defendants had revealed the true state of affairs at CaaStle in the representations received at those times.[9]

---

[9] As mentioned above, Crnkovic subsequently transferred these shares to his wife, plaintiff Rubsamen.

183.    Plaintiff Crnkovic made an additional investment in the Company on or around September 8, 2023 in the amount of $350,002.40.  Prior to that investment, Crnkovic was provided with additional false and misleading information regarding CaaStle, such as: (i) a June 21, 2022 email from Hunsicker offering shares at a "huge discount – 60% off the last round (which is a 3x multiple on today's ARR)" from the estate of a deceased investor that "defaulted on a bank loan he had taken out before he passed"; (ii) emails from defendant Hunsicker on July 25 and 26, 2022, offering discounted shares from one of the Company's "earlier investors" who was "now the director of a large Chinese public company" and was being pushed by the Chinese government "to sell his US tech stocks" "as quickly as humanly possible[,]" and representing that the Company would not "need to do another raise since [it was] so close to generating cash"; (iii) purported financials attached to that July 25, 2022 email that represented that CaaStle had generated revenue of $52,448,873 in the first quarter of 2022 and an operating loss of $3,754,791, revenue of $62,893,465 in the second quarter of 2022 and an operating loss of $3,087,734, and had $45,373,455 in cash and $53,742,844 of total assets as of the end of June 2022; (iv) a January 30, 2023 email from Hunsicker offering discounted shares from "an investor who . . . needed liquidity"; (v) a February 13, 2023 email from Hunsicker containing purported financials for the fourth quarter of 2022, which represented that CaaStle had generated "about $275M" in revenue in 2022, had "started making positive cash flow by the end of the year[,]" and had "about $50M in the bank" such that Hunsicker did not "foresee having to raise any more financing"; (vi) Hunsicker's statement in that same February 13, 2023 email that CaaStle had "signed over 350" "Creators/Influencers/Branded Affiliates" in 2022 and was "well ahead of plan" to sign an additional 1,500 in 2023, which "should add about $150-200M in revenue in 2023"; (vii) a February 20, 2023 email from Hunsicker representing that CaaStle was "on pace for $500M this

year in rev[enue] and $75M in [cash]"; (viii) a July 16, 2023 email from Hunsicker representing that the Company had "signed over 1,000 creators to [its] platform, which [was] driving profitable growth"; and (xv) an August 14, 2023 email from Hunsicker offering "cheap shares" due to another investor having "medical care/elder issue[.]"  Crnkovic would not have made this investment if Defendants had revealed the true state of affairs at CaaStle in the representations he received at those times.

184.    Plaintiff Crnkovic received additional false and misleading information regarding CaaStle after his investment, such as: (i) a November 30, 2023 email from Hunsicker projecting "$85M of profit this year on $500M of revenue" and offering an opportunity to pick up more discounted shares from "the same investor [Crnkovic] bought from in the summer"; and (ii) a January 26, 2024 email from Hunsicker again offering discounted shares.  If the true state of affairs had been revealed at any point during that time, Crnkovic would have exited his investment and/or pursued equitable or legal remedies.

185.    Prior to plaintiff Delta's first investment in the Company on or around April 13, 2017, in the amount of $3,526,617.50, Delta was provided with false and misleading information regarding CaaStle.  Delta would not have made this investment if the true state of affairs at CaaStle had been revealed in the representations it received at that time.

186.    Plaintiff Delta made a second investment on or around August 30, 2022, in the amount of $1,899,859.80, and continued to hold its initial investment, in reliance on additional false and misleading information regarding CaaStle.  Delta would not have made this investment and/or would have exited its investments and/or pursued equitable or legal remedies, if Defendants had revealed the true state of affairs at CaaStle in the representations it received at that time.

187.    Plaintiff Delta made another investment on or around April 11, 2023, in the amount of $150,002.80, and continued to hold its existing investments, in reliance on additional false and misleading information regarding CaaStle.  Delta would not have made this investment and/or would have exited its investments and/or pursued equitable or legal remedies, if Defendants had revealed the true state of affairs at CaaStle in the representations it received at that time.

188.    Plaintiff Delta received additional false and misleading information regarding CaaStle after mid-2023.  If the true state of affairs had been revealed at any point during that time, Delta would have would have exited its investments and/or pursued equitable or legal remedies.

189.    Plaintiff Flying Ventures made its first investment in the Company on or around August 1, 2014, in the amount of $50,000.  Flying Ventures made additional investments on or around October 3, 2014 for $50,000, and on or around October 6, 2022 for $100,000, and continued to hold these investments, in reliance on false and misleading information regarding CaaStle, such as: (i) an August 4, 2022 email from Hunsicker representing that CaaStle had generated "over $100M in revenue" in 2021 and was "on track to grow by ~75% in 2022"; and (ii) a September 7, 2022 email from Hunsicker about an opportunity to purchase discounted shares from a "bank[.]" Flying Ventures would not have made these investments and/or would have exited its investments and/or pursued equitable or legal remedies, if Defendants had revealed the true state of affairs at CaaStle in the representations it received at those times.

190.    Plaintiff Flying Ventures continued to hold its investments in reliance on further false and misleading information it received regarding CaaStle.  If the true state of affairs had been revealed at any point during that time, Flying Ventures would have exited its investments and/or pursued equitable or legal remedies.

191.    Plaintiff Jayant made his first investment in the Company on or around November 13, 2013, in the amount of $300,000.  Jayant made additional investments on or around June 4, 2015 for $300,000, June 30, 2021 for $400,000, and October 4, 2021 for $500,000, and continued to hold his investments, in reliance on false and misleading information regarding CaaStle, such as: (i) an update from defendants Hunsicker and Singh on August 23, 2015, stating that in the prior month "[g]uests" on the Company's platform had "exceeded 1M, and 12-14% of those convert to members over time"; and (ii) a "reading deck" from the Company received by Jayant on August 28, 2021, representing that CaaStle had generated "nearly $100M in net revenue in 2020" and projecting $145,782,864 in revenue in 2021, $285,400,000 in revenue in 2022, $586,450,000 in revenue in 2023, $1,052,500,000 in revenue in 2024, and $1,866,250,000 in revenue in 2025. Jayant would not have made these investments and/or would have exited his investments and/or pursued equitable or legal remedies, if Defendants had revealed the true state of affairs at CaaStle in the representations he received at those times.

192.    Plaintiff Jayant continued to hold his investments in reliance on further false and misleading information he received regarding CaaStle.  If the true state of affairs had been revealed at any point during that time, Jayant would have would have exited his investments and/or pursued equitable or legal remedies.

193.    Prior to plaintiff KCP Capital's investment in the Company on or around February 18, 2014, in the amount of $360,000, KCP Capital was provided with false and misleading information regarding CaaStle.  KCP Capital would not have made this investment if the true state of affairs at CaaStle had been revealed in the representations it received at that time.

194.    Plaintiff KCP Capital received additional false and misleading information regarding CaaStle after its investment.  If the true state of affairs had been revealed at any point

during that time, KCP Capital would have exited its investment and/or pursued equitable or legal remedies.

195.    Prior to plaintiff Kubera's first investment in the Company on or around February 17, 2023, in the amount of $415,000, Kubera was provided with false and misleading information regarding CaaStle on or around February 6, 2023, such as: (i) purported income statements showing revenue of $71,458,923 and an operating loss of $25,054,499 in 2018, revenue of $89,754,703 and an operating loss of $23,668,184 in 2019, revenue of $93,345,775 and an operating loss of $29,872,851 in 2020, revenue of $143,846,105 and an operating loss of $25,132,612 in 2021, and revenue of $115,342,338 and an operating loss of $6,842,525 in the first half of 2022; (ii) purported quarterly income statements for the first three quarters of 2022 showing revenue of $52,448,873 and an operating loss of $3,754,791 in the first quarter of 2022, revenue of $62,893,465 and an operating loss of $3,087,734 in the second quarter of 2022, and revenue of $77,007,659 and an operating loss of $36,009 in the third quarter of 2022, for total revenue of $192,349,997 and an operating loss of $6,878,534 for the year to date; (iii) purported monthly income statements showing revenue of $27,208,398 and an operating profit of $1,563,366 for October 2022 and revenue of $28,589,301 and an operating profit of $2,362,700 for November 2022; and (iv) revenue projections showing projected revenues of $277,375,183 in 2022, $503,200,000 in 2023, $854,800,000 in 2024, $1,474,600,000 in 2025, and $2,008,000,000 in 2026.  On or around February 8, 2023, Kubera received a purported balance sheet as of the end of November 2022 showing $58,516,450 in total assets and $45,985,329 in cash.  Kubera would not have made this investment if Defendants had revealed the true state of affairs at CaaStle in the representations it received at that time.

196.    Plaintiff Kubera made a second investment on or around May 18, 2023 for $600,000, and continued to hold its initial investment, in reliance on the false and misleading information it received regarding CaaStle.  Kubera would not have made this investment and/or would have exited its investments and/or pursued equitable or legal remedies, if Defendants had revealed the true state of affairs at CaaStle at that time.

197.    Plaintiff Kubera received additional false and misleading information regarding CaaStle after its investments, including on an investor call with defendant Hunsicker on January 7, 2025, at least two months after Defendants were all put on notice as to Hunsicker's falsification of financial reports.  If the true state of affairs had been revealed at any point during that time, Kubera would have exited its investments and/or pursued equitable or legal remedies.

198.    Prior to plaintiff Motwani's first investment in the Company on or around May 26, 2016, Motwani was provided with false and misleading information regarding CaaStle.  Motwani would not have made this investment if the true state of affairs at CaaStle had been revealed in the representations he received at that time.

199.    Plaintiff Motwani made additional investments on or around January 27, 2017, April 10, 2017, and August 27, 2018, and continued to hold his investments, in reliance on additional false and misleading information regarding CaaStle.  Motwani would not have made these investments and/or would have exited his investments and/or pursued equitable or legal remedies, if Defendants had revealed the true state of affairs at CaaStle in the representations he received at that time.

200.    Plaintiff Motwani received additional false and misleading information regarding CaaStle after his investments, such as: (i) statements made by Hunsicker during a call on March 24, 2023, including that CaaStle had generated $277 million in revenue in 2022 and that Hunsicker

anticipated roughly $500 million in revenue for 2023, and that CaaStle had $49 million in cash; (ii) statements made by Hunsicker on or around December 4, 2023, including that CaaStle was on target to generate $500 million in revenue in 2023; (iii) a purported balance sheet representing that CaaStle had $126,440,321 in total assets and $112,835,791 in cash as of the end of September 2023 and a purported income statement for the first three quarters of 2023 representing that CaaStle had $95,987,458 in revenue and an operating profit of $10,555,651 in the first quarter of 2023, $114,543,282 in revenue and an operating profit of $23,782,653 in the second quarter of 2023, and $143,540,315 in total revenue and an operating profit of $33,054,924 in the third quarter of 2023, sent by Hunsicker on December 4, 2023; (iv) a purported income statement for 2022 representing that CaaStle had $52,448,873 in total revenue and an operating loss of $3,754,791 in the first quarter of 2022, $62,893,465 in total revenue and an operating loss of $3,087,734 in the second quarter of 2022, $77,007,660 in total revenue and an operating loss of $36,010 in the third quarter of 2022, and $85,781,771 in total revenue and an operating profit of $5,954,300 in the fourth quarter of 2022, sent by Hunsicker on December 4, 2023; (v) a text message from Singh on January 8, 2025, claiming that he believed Hunsicker had not contacted Motwani because she was "swamped with some big deals"; and (vi) statements made by Hunsicker during a call on February 4, 2025, including that CaaStle had generated over $800 million in revenue in 2024 and $190 million in EBITDA.  If the true state of affairs had been revealed at any point during that time, Motwani would have exited his investments and/or pursued equitable or legal remedies.

201.    Prior to plaintiff Prospect's first investment in the Company on or around September 27, 2022, in the amount of $415,437.20, Prospect was provided with false and misleading information regarding CaaStle.  Prospect would not have made this investment if

Defendants had revealed the true state of affairs at CaaStle in the representations it received at that time.

202.     Plaintiff Prospect made a second investment on or around November 18, 2022 for $4,175,572.84, and continued to hold its initial investment, in reliance on additional false and misleading information regarding CaaStle.  Prospect would not have made this investment and/or would have exited its investments and/or pursued equitable or legal remedies, if Defendants had revealed the true state of affairs at CaaStle in the representations it received at that time.

203.     Plaintiff Prospect received additional false and misleading information regarding CaaStle after its investments, such as: (i) representations made by Hunsicker on a quarterly update call held on March 4, 2024, including that the Company had generated roughly $520,000,000 in revenue in 2023 and "more or less" $90,000,000 in cash, projected $825-$875 million in revenue and roughly $150,000,000 of cash for 2024, and had "about 550,000 users"; (ii) representations made by Hunsicker on a quarterly update call held on May 28, 2024, including that the Company was "nicely on track" to exceed $850,000,000 in revenue in 2024, had generated roughly $190,000,000 in revenue and operating profit of roughly $42,000,000 in the first quarter of 2024, and anticipated generating "north of" $150,000,000 in cash in 2024; (iii) falsified income statements for fiscal years 2017 through 2021 and the first half of fiscal year 2022; and (iv) falsified balance sheets as of the end of September 2021, the end of April 2022, and the end of June 2022. If the true state of affairs had been revealed at any point during that time, Prospect would have exited its investments and/or pursued equitable or legal remedies.

204.     Plaintiff Rubsamen acquired her investments in the Company from her husband, plaintiff Crnkovic, on or around December 2 and 3, 2020.  After she took ownership of the shares, Rubsamen received additional false and misleading information about CaaStle, such as: (i) a June

21, 2022 email from Hunsicker offering shares at a "huge discount – 60% off the last round (which

is a 3x multiple on today's ARR)" from the estate of a deceased investor that "defaulted on a bank

loan he had taken out before he passed"; (ii) emails from Hunsicker on July 25 and 26, 2022,

offering discounted shares from one of the Company's "earlier investors" who was "now the

director of a large Chinese public company" and was being pushed by the Chinese government "to

sell his US tech stocks" "as quickly as humanly possible[,]" and representing that the Company

would not "need to do another raise since [it was] so close to generating cash"; (iii) purported

financials attached to that July 25, 2022 email, which represented that CaaStle had generated

revenue of $52,448,873 in the first quarter of 2022 and an operating loss of $3,754,791, revenue

of $62,893,465 in the second quarter of 2022 and an operating loss of $3,087,734, and had

$45,373,455 in cash and $53,742,844 of total assets as of the end of June 2022; (iv) a January 30,

2023 email from Hunsicker offering discounted shares from "an investor who . . . needed

liquidity"; (v) a February 13, 2023 email from Hunsicker containing purported financials for the

fourth quarter of 2022, which represented that CaaStle had generated "about $275M" in revenue

in 2022, had "started making positive cash flow by the end of the year[,]" and had "about $50M

in the bank" such that Hunsicker did not "foresee having to raise any more financing"; (vi)

defendant Hunsicker's statement in that same February 13, 2023 email that CaaStle had "signed

over 350" "Creators/Influencers/Branded Affiliates" in 2022 and was "well ahead of plan" to sign

an additional 1,500 in 2023, which "should add about $150-200M in revenue in 2023"; (vii)

another email from defendant Hunsicker on February 20, 2023, which represented that CaaStle

was "on pace for $500M this year in rev[enue] and $75M in [cash]"; (viii) a July 16, 2023 email

from Hunsicker representing that the Company had "signed over 1,000 creators to [its] platform,

which [was] driving profitable growth"; (ix) an August 14, 2023 email from Hunsicker offering

"cheap shares" due to another investor having "medical care/elder issue"; (x) a November 30, 2023 email from Hunsicker projecting "$85M of profit this year on $500M of revenue" and offering an opportunity to pick up more discounted shares from "the same investor [Crnkovic] bought from in the summer"; and (xi) a January 26, 2024 email from Hunsicker again offering discounted shares. If the true state of affairs had been revealed at any point during that time, Rubsamen would have exited her investments and/or pursued equitable or legal remedies.

205.    Prior to plaintiff SA 1107's investment in the Company on or around December 7, 2023, in the amount of $301,605.20, SA 1107 was provided with false and misleading information regarding CaaStle, including, on or around December 4, 2023, that Hunsicker was offering a resale of shares from an existing investor at an 85% discount.  SA 1107 would not have made this investment if Defendants had revealed the true state of affairs at CaaStle in the representations it received at that time.

206.    Plaintiff SA 1107 received additional false and misleading information regarding CaaStle after its investment.  If the true state of affairs had been revealed at any point during that time, SA 1107 would have exited its investment and/or pursued equitable or legal remedies.

207.    Prior to plaintiff Shamdasani's first investment in the Company on or around May 30, 2014, in the amount of $250,000, Shamdasani was provided with false and misleading information regarding CaaStle.  Following this investment, Shamdasani was provided with additional false and misleading information regarding CaaStle, such as: (i) an August 4, 2022 email from Hunsicker, representing that CaaStle had generated "over $100M in revenue" in 2021 and was "on track to grow by ~75% in 2022"; and (ii) a September 7, 2022 email from Hunsicker about an opportunity to purchase discounted shares from a "bank[.]"  If the true state of affairs had been

revealed at any point during that time, Shamdasani would have exited his investment and/or pursued equitable or legal remedies.

208.    Prior to plaintiff Sobesha's first investment in the Company on or around November 11, 2021, in the amount of $2,500,000, Sobesha was provided with false and misleading information regarding CaaStle.  Sobesha would not have made this investment if Defendants had revealed the true state of affairs at CaaStle in the representations it received at that time.

209.    Plaintiff Sobesha made a second investment on or around January 13, 2022 for $499,999, and continued to hold its initial investment, in reliance on additional false and misleading information regarding CaaStle.  Sobesha would not have made this investment and/or would have exited its investments and/or pursued equitable or legal remedies if Defendants had revealed the true state of affairs at CaaStle in the representations it received at that time.

210.    Plaintiff Sobesha received additional false and misleading information regarding CaaStle after its investments.  If the true state of affairs had been revealed at any point during that time, Sobesha would have exited its investments and/or pursued equitable or legal remedies.

211.    Prior to plaintiff Sretno's first investment in the Company on or around December 20, 2013, in the amount of $499,999.77, Sretno was provided with false and misleading information regarding CaaStle.  Sretno made additional investments on or around March 16, 2014 for $199,999.28, and March 7, 2019 for $499,998.05, and continued to hold its investments, in reliance on false and misleading information regarding CaaStle, such as: (i) a February 19, 2014 email from Singh representing that the Company had a "run rate" of "about 6.5M" and "close to 8K" subscribers; (ii) an August 14, 2014 email from Hunsicker representing that the Company had "over 15,000 members" and was "growing at an average of 20-25% month over month"; (iii) an update from Hunsicker and Singh on August 23, 2015, stating that in the prior month "[g]uests"

on the Company's platform had "exceeded 1M, and 12-14% of those convert to members over time"; (iv) a December 21, 2015 email from Hunsicker and Singh stating that one of the Company's "older individual investors has a liquidity issue and needs liquidity on a part of their investment" and offering shares at "a (blended) ~15% discount" from the prior round of financing; (v) a February 11, 2017 email from Singh representing that the Company "would be profitable" if it chose "to not invest in growth"; and (vi) a March 1, 2019 email from Hunsicker containing a forecast for CaaStle that projected total revenue over the next twelve months of $90,900,000, $250,200,000 over the next twenty four months, $622,800,000 over the next thirty six months, $1,423,012,500 over the next forty eight months, and $3,044,081,250 over the next sixty months. Sretno would not have made these investments and/or would have exited its investments and/or pursued equitable or legal remedies if Defendants had revealed the true state of affairs at CaaStle in the representations it received at that time.

212.    Plaintiff Sretno made additional investments on or around July 28, 2022 for $500,005.20, September 14, 2022 for $500,005.20, and February 23, 2023 for $299,999.40, and continued to hold its investments, in reliance on additional false and misleading information regarding CaaStle, such as: (i) a June 21, 2022 email from Hunsicker offering shares at a "huge discount – 60% off the last round (which is a 3x multiple on today's ARR)" from the estate of a deceased investor that "defaulted on a bank loan he had taken out before he passed"; (ii) emails from defendant Hunsicker on July 25 and 26, 2022, offering discounted shares from one of the Company's "earlier investors" who was "now the director of a large Chinese public company" and was being pushed by the Chinese government "to sell his US tech stocks" "as quickly as humanly possible[,]" and representing that the Company would not "need to do another raise since [it was] so close to generating cash"; (iii) purported financials attached to that July 25, 2022 email, which

represented that CaaStle had generated revenue of $52,448,873 in the first quarter of 2022 and an operating loss of $3,754,791, revenue of $62,893,465 in the second quarter of 2022 and an operating loss of $3,087,734, and had $45,373,455 in cash and $53,742,844 of total assets as of the end of June 2022; (iv) a January 30, 2023 email from Hunsicker offering discounted shares from "an investor who . . . needed liquidity"; (v) a February 13, 2023 email from Hunsicker containing purported financials for the fourth quarter of 2022, which represented that CaaStle had generated "about $275M" in revenue in 2022, had "started making positive cash flow by the end of the year[,]" and had "about $50M in the bank" such that Hunsicker did not "foresee having to raise any more financing"; (vi) Hunsicker's statement in that same February 13, 2023 email that CaaStle had "signed over 350" "Creators/Influencers/Branded Affiliates" in 2022 and was "well ahead of plan" to sign an additional 1,500 in 2023, which "should add about $150-200M in revenue in 2023"; and (vii) another email from Hunsicker on February 20, 2023, which represented that CaaStle was "on pace for $500M this year in rev[enue] and $75M in [cash][.]"  Sretno would not have made these investments and/or would have exited its investments and/or pursued equitable or legal remedies if Defendants had revealed the true state of affairs at CaaStle in the representations it received at those times.

213.    Plaintiff Sretno received additional false and misleading information regarding CaaStle after its investments, such as: (i) an July 16, 2023 email from Hunsicker representing that the Company had "signed over 1,000 creators to [its] platform, which [was] driving profitable growth"; (ii) an August 14, 2023 email from Hunsicker offering "cheap shares" due to another investor having "medical care/elder issue"; (iii) a November 30, 2023 email from Hunsicker projecting "$85M of profit this year on $500M of revenue" and offering an opportunity to pick up more discounted shares from "the same investor [Crnkovic] bought from in the summer"; and

(iv) a January 26, 2024 email from Hunsicker again offering discounted shares.  If the true state of affairs had been revealed at any point during that time, Sretno would have would have exited its investments and/or pursued equitable or legal remedies.

214.    The GB Group made their first investment in the Company on March 1, 2013, when plaintiff Scherlis invested $50,000.  Plaintiff GB made its first investment on March 7, 2013, in the amount of $1,600,000.  Plaintiff GB made additional investments on or around February 7, 2014 for $122,893, June 9, 2014 for $216,669, August 26, 2014 for $186,429, and December 18, 2015 for $139,813 and $144,441.  Plaintiff Scherlis made additional investments on or around January 15, 2014 for $4,240, May 29, 2014 for $6,634, and November 23, 2015 for $3,035.35.  Prior to and following these investments, the GB Group received false and misleading information regarding CaaStle, such as: (i) Hunsicker's April 19, 2016 email stating that an "earlier investor had a liquidity issue, and was selling a small portion of their holding with [the Company's] help[,]" that the Company had already "offered" this opportunity "to a few of [its] investors, who purchased the shares directly from the investor together with some shares" from the previous round of financing, and that those investors had acquired "the totality of the shares they bought from [the Company] and the investor" at a 12.5% discount from the last round's valuation; (ii) an update from Defendant Hunsicker on or around November 30, 2016, in which Hunsicker represented that CaaStle had generated $28 million in revenue through the first nine months of 2016; and (iii) a Company update sent by Hunsicker on March 17, 2017, which represented that the Company had "hit profitability" on its "current customer base[,]" meaning that "if [the Company] stopped investing in growth, [it] would be profitable[,]" and thereafter would be "investing solely in growth."

215.    The GB Group continued to hold their investments in CaaStle, and made additional investments, in reliance on this false and misleading information.  GB made two investments on June 2, 2017 for $1,168,650 and $874,300, and two more investments on or around August 17, 2018 for $2,099,075 and $742,640.  Plaintiff Whire made its first investment of $786,457 on or around August 17, 2018.  The GB Group would not have made these investments and/or would have exited their investments and/or pursued equitable or legal remedies if Defendants had revealed the true state of affairs at CaaStle in the representations it received at those times.

216.    On August 10, 2019, defendant Hunsicker sent the GB Group a purported income statement for the second quarter of fiscal year 2019 and a purported balance sheet as of the end of June 2019.  These financials represented that CaaStle had generated $22,152,888 in revenue and an operating loss of $7,077,839 in the second quarter of 2019, and had $44,198,164 in total assets and $31,282,055 in cash as of the end of June 2019.

217.    The GB Group continued to hold their investments in CaaStle, and made additional investments, in reliance on this false and misleading information.  Plaintiff Scherlis made another investment on or around August 6, 2020 for $50,000.  Plaintiff Whire made a second investment on or around March 4, 2020 for $2,009,420.  On or around August 6, 2020, plaintiff KF Foundation invested $2,325,000 and plaintiffs Silver and K. Isaacs each invested $50,000.  On or around August 20, 2021, plaintiff Weisman invested $500,000 and plaintiff Rockstream invested $1,999,997.  Plaintiff Dive invested $2,200,002 on or around November 30, 2021.  The GB Group would not have made these investments and/or would have exited their investments and/or pursued equitable or legal remedies if Defendants had revealed the true state of affairs at CaaStle in the representations it received at those times.

218.    On or around June 23, 2022, Defendant Hunsicker had a call with the GB Group, during which she told them that a purported existing shareholder was being forced to sell off his U.S. tech stocks by the Chinese government.  Hunsicker represented that the shareholder needed to sell quickly and was offering a substantial discount of $2.50 per share, compared to the $6.20 per share commanded in CaaStle's last fundraising round, for a total purchase price of $1.125 million.

219.    The GB Group continued to hold their investments in CaaStle, and made additional investments, in reliance on this false and misleading information.  Plaintiff Alpine took Hunsicker's purported discounted resale opportunity for the full $1,125,000 offered on or around June 28, 2022, and subsequently made another investment of $500,005 on or around September 14, 2022.  On or around March 8, 2023, plaintiff Silver invested another $250,003, plaintiff K. Isaacs invested another $50,000, and plaintiff Y. Isaacs made his first investment of $10,000.  On or around March 9, 2023, plaintiff Scherlis invested another $60,003.60.  The GB Group would not have made these investments and/or would have exited their investments and/or pursued equitable or legal remedies if Defendants had revealed the true state of affairs at CaaStle in the representations it received at those times.

220.    On August 31, 2023, defendant Hunsicker sent the GB Group purported financials via email for fiscal year 2022 and the first half of 2023, which represented that CaaStle had generated $52,448,873 of revenue and a $3,754,791 operating loss in the first quarter of 2022, $62,893,465 of revenue and a $3,087,734 operating loss in the second quarter of 2022, $77,007,660 of revenue and a $36,010 operating loss in the third quarter of 2022, $85,781,771 of revenue and a $5,954,300 operating profit in the fourth quarter of 2022, $95,987,458 in revenue and a $10,555,651 operating profit in the first quarter of 2023, and $114,543,282 in revenue and a

$23,782,653 operating profit in the second quarter of 2023.  On or around September 1, 2023, in reliance on this false and misleading information, plaintiff Silver invested an additional $100,000, plaintiff K. Isaacs invested another $40,000, and plaintiff Y. Isaacs invested another $10,000.  The GB Group would not have made these investments and would have exited their existing investments and/or pursued equitable or legal remedies if Defendants had revealed the true state of affairs at CaaStle in the representations they received at that time.

221.    The GB Group continued to hold their investments in the Company in reliance on additional false and misleading information regarding CaaStle received in late 2023 and 2024, such as: (i) plaintiff Silver's conversation with Callon in Callon's offices in Tokyo on October 16, 2023, during which Callon reassured Silver regarding CaaStle's operations and represented that the Company was profitable and cash-flow positive; (ii) financials purportedly audited by BDO, sent by Hunsicker via email on December 6, 2023, that showed $42,706,337 in cash and $56,132,423 in total assets for fiscal year 2022 and $30,252,380 in cash and $44,386,542 in total assets for fiscal year 2021, and $238,467,541 in net revenue and $17,120,375 in total comprehensive loss for fiscal year 2022 and $120,536,158 in net revenue and $33,707,978 in total comprehensive loss for fiscal year 2021; and (iii) a purported income statement and balance sheet for fiscal year 2023, sent via email by Hunsicker on February 16, 2024, that represented that CaaStle had $134,918,532 in cash as of the end of December 2023 and $151,316,743 in total assets, and had generated $95,987,458 in revenue and an operating profit of $10,555,651 in the first quarter of 2023, $114,543,282 in revenue and an operating profit of $25,156,486 in the second quarter of 2023, $143,540,315 in revenue and an operating profit of $33,054,924 in the third quarter of 2023, and $165,346,810 in revenue and an operating profit of $23,200,990 in the fourth

quarter of 2023.  If the true state of affairs had been revealed at any point during that time, the GB Group would have exited their investments and/or pursued equitable or legal remedies.

222.    Prior to plaintiff J. Volkwyn's first investment in the Company on or around September 7, 2016, in the amount of $500,000, J. Volkwyn was provided with false and misleading information regarding CaaStle.  J. Volkwyn would not have made this investment if the true state of affairs at CaaStle had been revealed in the representations she received at that time.

223.    Plaintiff J. Volkwyn made additional investments on or around April 12, 2017 for $500,000, November 6, 2017 for $250,000, and February 26, 2019 for $260,000, and continued to hold her investments, in reliance on additional false and misleading information regarding CaaStle. J. Volkwyn would not have made these investments and/or would have exited her investments and/or pursued equitable or legal remedies if Defendants had revealed the true state of affairs at CaaStle in the representations she received at that time.

224.    Plaintiff J. Volkwyn received additional false and misleading information regarding CaaStle after her investments.  If the true state of affairs had been revealed at any point during that time, J. Volkwyn would have exited her investments and/or pursued equitable or legal remedies.

225.    Prior to plaintiff S. Volkwyn's first investment in the Company on or around September 7, 2016, in the amount of $500,000, S. Volkwyn was provided with false and misleading information regarding CaaStle.  S. Volkwyn would not have made this investment if the true state of affairs at CaaStle had been revealed in the representations he received at that time.

226.    Plaintiff S. Volkwyn made additional investments on or around April 12, 2017 for $500,000, November 6, 2017 for $500,000, and February 26, 2019 for $260,000, and continued to hold his investments, in reliance on additional false and misleading information regarding CaaStle. S. Volkwyn would not have made these investments and/or would have exited his investments

and/or pursued equitable or legal remedies if Defendants had revealed the true state of affairs at CaaStle in the representations he received at that time.

227.    Plaintiff S. Volkwyn received additional false and misleading information regarding CaaStle after his investments.  If the true state of affairs had been revealed at any point during that time, S. Volkwyn would have exited his investments and/or pursued equitable or legal remedies.

228.    Plaintiff Winter made his first investment in the Company on or around December 9, 2013, in the amount of $249,384.52.  Winter made additional investments on or around October 7, 2014 for $308,215.25, February 5, 2015 for $129,953,07, and August 1, 2018 for $299,997.80. Prior to and following these investments, Winter was provided with false and misleading information regarding CaaStle, such as: (i) on or around July 3, 2023, purported audited financial statements for the years ending September 30, 2021 and 2020, showing revenue of $120,536,158, an operating loss of $33,707,978, total assets of $44,386,542, and cash of $30,252,380 for 2021 and revenue of $89,971,176, an operating loss of $29,554,141, total assets of $43,903,625, and cash of $32,203,690 for 2020; (ii) on or around July 3, 2023, a purported 2023 YTD income statement showing revenue of $131,742,058 and an operating profit of $17,365,565; and (iii) an email from Hunsicker, forwarded to Winter on or around August 24, 2023, containing a purported balance sheet as of the end of June 2023, which showed total assets of $93,680,952 and cash of $80,741,969.  Winter continued to hold his investments in CaaStle in reliance on this false and misleading information.  If the true state of affairs had been revealed at any point during that time, Winter would have would have exited his investments and/or pursued equitable or legal remedies.

229.    Prior to plaintiff 734 Trust's investment in the Company on or around April 11, 2022, in the amount of $434,000, 734 Trust was provided with false and misleading information

regarding CaaStle.  734 Trust would not have made this investment if Defendants had revealed the true state of affairs at CaaStle in the representations it received at that time.

230.    Plaintiff 734 Trust received additional false and misleading information regarding CaaStle after its investment.  If the true state of affairs had been revealed at any point during that time, 734 Trust would have would have exited its investment and/or pursued equitable or legal remedies.

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against Hunsicker and Singh)**

231.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

232.    This Count is asserted against Hunsicker and Singh for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

233.    This Count is asserted only with respect to those violations of Section 10(b) of the Exchange Act and Rule 10b-5 occurring within five years prior to the date of the filing of this complaint.

234.    Hunsicker and Singh carried out a plan, scheme and course of conduct which was intended to and, throughout the period of time described herein, did: (i) deceive Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to purchase CaaStle's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, these defendants, and each defendant, took the actions set forth herein.

235.    Hunsicker and Singh (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CaaStle's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

236.    Hunsicker and Singh, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CaaStle's financial well-being and prospects, as specified herein.

237.    Hunsicker and Singh employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs of CaaStle's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about CaaStle and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs.

238.    Hunsicker and Singh's primary liability and controlling person liability arises from the following facts: (i) Hunsicker and Singh were high-level executives and/or directors at the Company at all relevant times and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and

was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to Plaintiffs which they knew and/or recklessly disregarded was materially false and misleading.

239.    Hunsicker and Singh had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CaaStle's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.

240.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the price of CaaStle's securities was artificially inflated during the period of time described herein.  In ignorance of the fact that the prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Hunsicker and Singh, and/or in the absence of material adverse information that was known to or recklessly disregarded by Hunsicker and Singh, but not disclosed in statements made by them, Plaintiffs acquired CaaStle securities at artificially high prices and were damaged thereby.

241.    At the time of said misrepresentations and/or omissions, Plaintiffs were ignorant of their falsity and believed them to be true.  Had Plaintiffs known the truth regarding the problems that CaaStle was experiencing, which were not disclosed by Hunsicker and Singh, Plaintiffs would not have purchased their CaaStle securities, or, if they had acquired such securities during the

period of time described herein, they would not have done so at the artificially inflated prices which they paid.

242.    By virtue of the foregoing, Hunsicker and Singh violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

243.    As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases of the Company's securities.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### (Against All Defendants)

244.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

245.    Defendants acted as controlling persons of CaaStle within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial information disseminated to Plaintiffs, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Defendants were provided with or had unlimited access to copies of the Company's internal budgets, plans, projections and/or reports, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

246.    In particular, Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

247.    As set forth above, Hunsicker and Singh each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Company's securities.

## COUNT III
### For Common Law Fraud
### (Against Hunsicker and Singh)

248.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

249.    Hunsicker and Singh committed fraudulent inducement, fraudulent concealment, and constructive fraud as set forth herein by, *inter alia*, intentionally making numerous misstatements and misrepresentations of material facts to Plaintiffs, and further, concealing or failing to disclose material information to Plaintiffs that they knew were not true or did not believe to be true, including, but not limited to, that: (i) CaaStle's financial statements were not being audited by BDO; (ii) CaaStle's financial statements were inaccurate and misleading, and did not fairly present, in all material respects, the financial condition and results of operations of the Company; (iii) CaaStle's results of operations and business prospects represented to investors were often fictitious; and (iv) as a result of the foregoing, Hunsicker and Singh's statements to investors and potential investors were materially false and misleading at all relevant times.

250.    Hunsicker and Singh knew that the representations made were false when made.

251.    Hunsicker and Singh made the foregoing intentional misrepresentations or omissions with the intent that Plaintiffs rely upon those misstatements or omissions.

252.    Hunsicker's and Singh's false and misleading representations, concealment, or silence induced Plaintiffs to invest in CaaStle.

253.    Plaintiffs justifiably relied upon Hunsicker's and Singh's false and misleading representations, concealment, or silence, which induced them to invest in CaaStle.

254.    As a direct and proximate result of such reliance, Plaintiffs have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

### COUNT IV
### Aiding and Abetting Fraud
### (Against All Defendants)

255.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

256.    As alleged above, Hunsicker and Singh committed fraud, intentionally making numerous misstatements and misrepresentations to Plaintiffs, and/or concealing or failing to disclose material information to Plaintiffs, that they knew were not true or did not believe to be true, when made.

257.    To the extent that Defendants Hunsicker and Singh were not directly responsible for the fraudulent statements and omissions, they aided and abetted one another by providing substantial assistance, by, among other things, failing to report the fraud to Plaintiffs.

258.    Defendants Goldenberg, Jain, and Callon aided and abetted the fraud perpetrated by Hunsicker and Singh, providing substantial assistance by, among other things, failing to report the fraud to Plaintiffs and other investors.

259.     Through Defendants' direct control over CaaStle as the officers and directors of the Company, Defendants Hunsicker, Singh, Goldenberg, Jain, Callon, and Hennessy had actual knowledge of the fact that the other Defendants were making false and misleading representations to Plaintiffs concerning CaaStle's financial condition, including that the auditor had been relieved of its duties years prior and that the Board was investigating Hunsicker for fraudulent conduct.

260.     Defendant Hennessy aided and abetted the fraud perpetrated by one or more of the other Defendants with actual knowledge that his presence on the Board would serve as a critical endorsement of Hunsicker and her compatriots.

261.     Hennessy knew that his participation as a member of the Board would provide reassurance to investors.  While knowing that his name would reassure investors, instead of performing his duties as a director, Hennessy abdicated and ignored his responsibility to ensure that CaaStle operated within legal bounds.  Hennessy also left the board in December 2024 without notifying Plaintiffs or other investors of the truth regarding the reason for his departure.  Hennessy was reckless and his conduct knowingly and substantially aided and abetted Hunsicker, Singh, and the other Defendants in the scheme to defraud set forth herein.

262.     Accordingly, Defendants knowingly participated in the fraud by the other Defendants and are liable to Plaintiffs for damages.

**COUNT V**
**Civil Conspiracy**
**(Against Hunsicker, Singh, Goldenberg, Jain, and Callon)**

263.     Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

264.     Hunsicker, Singh, Goldenberg, Jain, and Callon conspired to misrepresent CaaStle's true financial and operating condition to investors to induce Plaintiffs to invest in the

Company and/or retain their investment. Further, these defendants knowingly concealed the conspiracy from investors including the period after December 2024.

265. In furtherance of this conspiracy, these defendants aided and abetted the fraud, and Hunsicker and Singh issued fraudulent false and misleading statements to Plaintiffs, among other things. Hunsicker, Singh, Goldenberg, Jain, and Callon knew of and actively sought to further this conspiracy.

266. Hunsicker, Singh, Goldenberg, Jain, and Callon knew and acknowledged that Plaintiffs would rely on the information provided to them regarding the financial and business condition of CaaStle, including its financial statements, in making individual investment decisions.

267. Plaintiffs were harmed through the fraud and negligent misrepresentations described herein.

268. Hunsicker, Singh, Goldenberg, Jain, and Callon are liable for this harm as members of the Hunsicker Conspiracy.

269. As a direct and proximate result of these defendants' conduct, Plaintiffs have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

### COUNT VI
**Negligent Misrepresentation**
**(Against Hunsicker, Singh, Goldenberg, Jain, and Callon)**

270. Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for the allegations of fraud.

271. Hunsicker, Singh, Goldenberg, Jain, and Callon had a duty to give accurate information regarding CaaStle and its financial and business condition to investors, including Plaintiffs.

272.    Hunsicker, Singh, Goldenberg, Jain, and Callon knew and acknowledged that Plaintiffs would rely on the information provided to them regarding the financial and business condition of CaaStle, including its financial statements, in making individual investment decisions.

273.    Hunsicker, Singh, Goldenberg, Jain, and Callon made numerous false and misleading representations about CaaStle's financial and business condition to Plaintiffs and failed to provide material information, as described herein.

274.    Hunsicker, Singh, Goldenberg, Jain, and Callon were negligent in their failure to exercise reasonable care.  These defendants' conduct was an extreme departure from the ordinary standard of care and more than ordinary inadvertence or inattention.

275.    Plaintiffs justifiably relied on these defendants' statements in deciding to invest in CaaStle and/or to continue holding their shares of CaaStle.  Plaintiffs' reliance on these defendants' false and misleading representations and omissions of material adverse information was a substantial factor in causing their harm.

276.    As a result of these defendants' conduct, Plaintiffs have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

<u>COUNT VII</u>
**Aiding and Abetting Negligent Misrepresentation**
**(Against All Defendants)**

277.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for the allegations of fraud.

278.    Each Defendant, as an officer and director of CaaStle, owed a duty of care to Plaintiffs.

279.    If any Defendants are not directly liable for any negligent misrepresentations, then by reason of the allegations set forth above, any such Defendant is liable for aiding and abetting in the negligent misrepresentations made by the other Defendants who are liable for negligent misrepresentations.

280.    Defendant Hennessy aided and abetted the other Defendants' negligent misrepresentations by serving as a member of the Board, which he knew would reassure investors. Instead of performing his duties as a director, Hennessy abdicated and ignored his responsibility to ensure that CaaStle operated within legal bounds.  Hennessy was reckless and his conduct knowingly and substantially aided and abetted the other defendants in their negligent misrepresentations and omissions to investors as described herein.

281.    Further, Hennessy left the CaaStle Board in December 2024.  He did so without taking action to notify investors or disclose what occurred under his tenure.  In doing so, Hennessy further knowingly gave substantial assistance to the other defendants' negligent misrepresentations during the period from November 2024 until Hunsicker's misconduct was revealed to investors in March 2025.

282.    Accordingly, Defendants are liable to Plaintiffs for damages resulting from certain others' negligent misrepresentations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

(A)    Awarding all forms of recovery allowed under law and equity, including rescission, restitution, disgorgement, injunctive and other equitable relief, compensatory, and punitive damages, in favor of Plaintiffs, in an amount not less than $80 million;

(B)    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and costs; and

(C)    Granting such other relief as the Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated:  January 22, 2026                    Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/  *Brandon Walker*
Brandon Walker
Lawrence P. Eagel
Marion C. Passmore
Melissa A. Fortunato
810 Seventh Avenue, Suite 620
New York, New York 10019
Telephone: (212) 308-5858
Facsimile:  (212) 214-0506
Email: walker@bespc.com
        eagel@bespc.com
        passmore@bespc.com
        fortunato@bespc.com

*Attorneys for Plaintiffs*